[No. D026826. Fourth Dist., Div. One. Mar. 24, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY L. JOHNSON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II-IV.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Pamela A. Ratner, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KREMER, P. J.**—Anthony L. Johnson was convicted of numerous violent sexual offenses, kidnappings and robberies. He was sentenced to five consecutive life terms plus four hundred forty years. On appeal, he contends he was denied his right to testify in his own defense, one count was not supported by substantial evidence, he should not have been convicted of both kidnappings and kidnappings for robbery based on the same conduct and he contends the abstract of judgment must be modified to conform to the oral pronouncement of judgment. We conclude the court erred in denying Johnson his constitutional right to testify but find the error harmless beyond a reasonable doubt. We also agree the simple kidnapping convictions on counts 9, 14, 40, 48 and 67 should be reversed and the abstract of judgment should be corrected to conform to the oral pronouncement of judgment. In all other respects, we affirm.

### FACTS

Because of the nature of the issues on appeal, it is not necessary to set out a detailed recitation of the facts of each of the sexual assaults, except as to one victim which we discuss in more detail in the unpublished part of this opinion. The evidence shows Johnson kidnapped, robbed and committed brutal sexual offenses against seven different women over a period of several years. Six of the offenses involved a distinctive modus operandi of approaching the victim very late at night as she was getting out of her car or shortly thereafter,[2] forcing her back into the driver's seat while the assailant sat in the backseat, threatening to kill the victim if she did not obey, directing her to drive the car only a short distance (i.e., a matter of blocks), having her park the car and then pulling her into the backseat where he sexually assaulted her. As to the remaining victim (discussed in more detail in the unpublished part), Johnson assaulted her early in the morning while she was jogging near a college campus. In all the cases, Johnson raped and sodomized the victims, usually more than once and often in cycles. Johnson also had most of the victims orally copulate him or he orally copulated them. Johnson demanded money from the victims and went through most of their purses before leaving. After the attack, all of the victims had physical injuries or a demeanor consistent with having been forcibly raped and sodomized.

Two of the victims identified Johnson in a lineup. DNA evidence recovered in 5 of the cases matched Johnson with a random match probability of

---

[2]Five of these women were attacked after they had parked their cars near their homes. One woman was attacked after she had parked her car at a grocery store.

1 in 3,600,000. Additionally, Johnson's fingerprints were recovered from two of his victim's vehicles, including one of the two cases where no DNA evidence was recovered. As to the one remaining victim where there was neither DNA nor fingerprint evidence, blood testing indicated Johnson could not be excluded as a donor of the sperm found in the victim and a pubic hair with characteristics similar to Johnson's pubic hair was found in the victim's car.

Johnson did not present any evidence except a stipulation that, if called to the stand, a police detective would testify he interviewed a witness who saw a person matching the description of the victim who was attacked near the college campus followed by a Black man (Johnson is Black) but did not pay much attention to them as they both appeared to be "homeless types."

We set out in more detail the circumstances surrounding his denial of his right to testify. At trial, after the prosecution had completed its case-in-chief, defense counsel requested and was granted an in camera hearing. Johnson was present during the in-chambers conference. Defense counsel told the court he had "an ethical conflict" with Johnson about Johnson's desire to take the stand and testify. Defense counsel explained, "I cannot disclose to the court privileged communications relating to that, but I'm in a position where I am not willing to call Mr. Johnson as a witness despite his desire to testify." In response to the court's question, Johnson indicated defense counsel had accurately described the situation and defense counsel indicated he would "[n]ot voluntarily" call Johnson as a witness.

The court, misunderstanding the situation, told Johnson that his attorney had decided it was not in Johnson's "best interest to testify" and confirmed Johnson wanted to testify. The following exchange then occurred:

"[DEFENSE COUNSEL]: Judge, this is not a trial tactic issue. This is an ethical conflict. If it were just a trial tactic, you know, in other words, a decision of what's the best choice, I always defer to the client's wishes in circumstances like this.

"THE COURT: What exactly are you trying to tell me . . . that you won't examine him if he takes the stand?

"[DEFENSE COUNSEL]: I think under the—based upon the information I have, I would be ethically barred from calling him as a witness under the law as I have come to know it and very specifically researched it regarding this particular issue.

"THE COURT: Okay. [¶] It's always very difficult for a trial judge based on my experience at least to sit in on these. It is like having both your hands

tied behind your back because you have to make a decision. If your call based on what you know is that you have an ethical problem that will compel you not to call him and that that's over his objection, then I'll note it for the record. He will not be called—

"[DEFENSE COUNSEL]: That's fine.

"THE COURT: —Based on that. And we'll go forward. And you have in essence done everything you are required to do as an attorney by placing it on the record. And at this point in time I'm going to have to abide by it because you're the one that's making the call on the ethical issue.

"[DEFENSE COUNSEL]: Yes. I just want to be clear that this isn't a judgment situation that falls in the realm of a trial tactic. It's more than that.

"THE COURT: All right. [¶] I will note, then, that you believe that there are ethical reasons, strong ethical reasons, apparently, because otherwise we wouldn't be sitting in here right now,—

"[DEFENSE COUNSEL]: Correct.

"THE COURT: —That cause you to come to the conclusion that you cannot under any circumstances call the client. And I will note that. And I will note that it's over his objection, and that he desires to testify."

Johnson did not testify.

## DISCUSSION

### I

#### A. *Development of the Right to Testify*

Under the early common law, interested parties, including persons accused of committing a crime, were disqualified from presenting sworn testimony. (97 C.J.S. (1957) Witnesses, § 120, p. 545; *Ferguson* v. *Georgia* (1961) 365 U.S. 570, 573 [81 S.Ct. 756, 758-759, 5 L.Ed.2d 783].) This disqualification of parties from presenting sworn testimony was clearly established by the end of the 16th century in civil cases on the basis the party's testimony was untrustworthy. (*Ferguson* v. *Georgia, supra,* at p. 573 [81 S.Ct. at pp. 758-759].) Disqualification of criminal defendants "seems to have come somewhat later. In the sixteenth century it was necessary for an accused to conduct his own defense, since he was neither allowed to call witnesses in his behalf nor permitted the assistance of counsel. [Citation.]

The criminal trial of this period has been described as 'a long argument between the prisoner and the counsel for the Crown, in which they questioned each other and grappled with each other's arguments with the utmost eagerness and closeness of reasoning.' [Citation.] In the process the defendant could offer by way of explanation material that would later be characterized as testimony. [Citation.]" (*Id.* at pp. 573-574 [81 S.Ct. at p. 759].)

By the 17th century in England, a criminal defendant was allowed to call witnesses and by 1701 had the right to call witnesses to testify under oath but the defendant himself was still precluded from giving sworn testimony. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570, 574 [81 S.Ct. 756, 759].) This rule deeming criminal defendants incompetent to give sworn testimony was adopted in this country. (*Ibid.*)

By the mid-19th century, parties and interested witnesses in civil cases were allowed to give sworn testimony in England and in most states in this country. (O'Neill, *Vindicating the Defendant's Constitutional Right to Testify at a Criminal Trial: The Need for an on-the-Record Waiver* (1990) 51 U. Pitt. L.Rev. 809, 813, citing inter alia Popper, *History and Development of the Accused's Right to Testify* (1962) Wash. U. L.Q. 454, 458.) The elimination of the disqualification was based primarily on an argument that ". . . a witness's motive for lying should go to the weight, not the admissibility, of testimony." (51 U. Pitt. L.Rev. at p. 813.) As one legal commentator argued in 1835: " '[A]ll evidence should be taken at what it may be worth, that no consideration which has a tendency to produce conviction in a rational mind should be excluded from the consideration of the tribunals.' " (Lord Macaulay's Legis. Minutes, 1835, pp. 127-128, as quoted in *Ferguson* v. *Georgia, supra,* 365 U.S. 570, 575 [81 S.Ct. 756, 760].)

Criminal defendants, however, were still deemed incompetent to testify. The two main arguments against permitting criminal defendants to testify were: (1) criminal defendants were so likely to commit perjury to avoid conviction that their testimony was inherently untrustworthy[3] and (2) permitting criminal defendants to testify would erode the constitutional right to

---

[3]As one commentator wrote in the 1860's: "[T]he prisoner could never be a real witness; it is not in human nature to speak the truth under such a pressure as would be brought to bear on the prisoner, and it is not a light thing to institute a system which would almost enforce perjury on every occasion. It is a mockery to swear a man to speak the truth who is certain to disregard it . . . ." (Stephen, *A General View of the Criminal Law of England* (1863) pp. 201-202, as reported in O'Neill, *Vindicating the Defendant's Constitutional Right to Testify at a Criminal Trial: The Need for an on-the-Record Waiver, supra,* 51 U. Pitt. L.Rev. 809, 814, also quoted in part in *Ferguson* v. *Georgia, supra,* 365 U.S. 570, 582 [81 S.Ct. 756, 763]. See also *State* v. *McKinnon* (1943) 223 N.C. 160, 164 [25 S.E.2d 606, 609] [" 'The common law regarded the testimony of a defendant in criminal actions as incompetent upon the theory,

remain silent and the presumption of innocence because suspicion would fall on the defendant who failed to testify.[4]

Maine was the first state to enact a statute providing that a criminal defendant was competent to testify. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570. A Maine Supreme Court justice was a primary proponent of deeming criminal defendants competent to testify. He "justified competency as a necessary protection for the innocent" and "believed that incompetency had served the guilty as a shield and thus disserved the public interest. Competency, he thought, would open the accused to cross-examination and permit an unfavorable inference if he declined to take the stand to exculpate himself." (*Id.* at pp. 579-580 [81 S.Ct. at p. 762].)[5]

Within 20 years most states, including California, had eliminated the prohibition against criminal defendants providing testimony. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570, 577 & fn. 6 [81 S.Ct. 756, 760-761].) Finally, by 1960, all states except Georgia, had provided a criminal defendant was competent to testify in his own behalf. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570.) "Experience under the American competency statutes was to change the minds of many who had opposed them. It was seen that the shutting out of his sworn evidence could be positively hurtful to the accused, and that innocence was in fact aided, not prejudiced, by the opportunity of the accused to testify under oath. An American commentator discussing the Massachusetts statute in the first year of its operation said: 'We have always been of the opinion, that the law permitting criminals to testify would aid in the detection of guilt; we are now disposed to think that it will be equally serviceable for the protection of innocence.' [Citations.]" (*Ferguson* v. *Georgia, supra,* 365 U.S. 570, 580-581 [81 S.Ct. 756, 762].) Another commentator who had strongly opposed allowing criminal defendants to testify (see fn. 3, *ante*), changed his opinion after the incompetency laws had

among others, that the frailty of human nature and the overpowering desire for freedom would ordinarily induce a person charged with [a] crime, if permitted to testify, to swear falsely.' "].)

[4]This viewpoint is reflected in *People* v. *Thomas* (1864) 9 Mich. 314, 320-321 (quoted in *Ferguson* v. *Georgia, supra,* 365 U.S. 570, 578-579 [81 S.Ct. 756, 761-762]): " '[I]f we were to hold that a prisoner offering to make a statement must be sworn in the cause as a witness, it would be difficult to protect his constitutional rights in spite of every caution, and would often lay innocent parties under unjust suspicion where they were honestly silent, and embarrassed and overwhelmed by the shame of a false accusation. . . . [It would result in] . . . the degradation of our criminal jurisprudence by converting it into an inquisitory system, from which we have thus far been happily delivered.' "

[5]The *Ferguson* court noted the Maine Supreme Court justice was not "a friend of the privilege against self-incrimination" and refers the interested reader to Thayer, *A Chapter of Legal History in Massachusetts* (1895) 9 Harv. L.Rev. 1, 12, for further information on Appleton's role in the movement to extend competency. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570, 579-580, & fn. 11 [81 S.Ct. 756, 761-762].)

been changed: " 'I am convinced by much experience that questioning, or the power of giving evidence, is a positive assistance, and a highly important one, to innocent men, and I do not see why in the case of the guilty there need be any hardship about it. . . . A poor and ill-advised man . . . is always liable to misapprehend the true nature of his defence [*sic*], and might in many cases be saved from the consequences of his own ignorance or misfortune by being questioned as a witness.' 1 Stephen, History of the Criminal Law of England, pp. 442, 444." (*Ferguson* v. *Georgia, supra,* 365 U.S. 570, 582 [81 S.Ct. 756, 763].)

In 1960, the United States Supreme Court struck down the last remaining state statute (in Georgia) which provided a criminal defendant was incompetent to give sworn testimony. (*Ferguson* v. *Georgia, supra,* 365 U.S. 570.) The court held Georgia's statute which permitted only unsworn testimony by a criminal defendant denied the defendant his right to assistance of counsel during every step of the proceedings. (*Id.* at p. 596 [81 S.Ct. at p. 770].)

In 1975, the United States Supreme Court recognized that a criminal defendant had a constitutional right under the Sixth Amendment to act as his own attorney and, in dicta, referred to a criminal defendant's right to testify. (*Faretta* v. *California* (1975) 422 U.S. 806, 834, fn. 45 [95 S.Ct. 2525, 2450, 45 L.Ed.2d 562].)

In 1987, the United States Supreme Court explicitly held a criminal defendant had a constitutional right to testify on his own behalf. (*Rock* v. *Arkansas* (1987) 483 U.S. 44 [107 S.Ct. 2704, 97 L.Ed.2d 37].) The Supreme Court stated the right to testify "is one of the rights that 'are essential to due process of law in a fair adversary process' " (*id.* at p. 51 [107 S.Ct. at p. 2709]) and was protected by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution (*id.* at pp. 51-53 [107 S.Ct. at pp. 2708-2710]). The court explained, "The opportunity to testify is . . . a necessary corollary to the Fifth Amendment's guarantee against compelled testimony" since the privilege against self-incrimination " 'is fulfilled only when the accused is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." . . . The choice of whether to testify in one's own defense . . . is an exercise of the constitutional privilege.' " (*Id.* at pp. 52-53 [107 S.Ct. at pp. 2709-2710].)

The court also found the right to testify "in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call 'witnesses in his favor' " since "[l]ogically included in the accused's right to call witnesses whose testimony is 'material and favorable to his defense,' [citation] is a right to testify himself, should he decide it is in his favor to do

so." (*Rock* v. *Arkansas, supra,* 483 U.S. 44, 52 [107 S.Ct. 2704, 2709].) Indeed, as the Supreme Court pointed out in *Rock* v. *Arkansas,* ". . . the most important witness for the defense in many criminal cases is the defendant himself." (*Ibid.*) Further, the court stated, the Sixth Amendment " 'grants to the accused *personally* the right to make his defense' " which includes the "right to present his own version of events in his own words." (*Ibid.,* italics in original.)

The court also held ". . . the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law [which includes the] right to be heard and to offer testimony," necessarily includes the criminal defendant's right to testify in his own behalf. (*Rock* v. *Arkansas, supra,* 483 U.S. 44, 51 [107 S.Ct. 2704, 2708].) The Supreme Court concluded: "There is no justification today for a rule that denies an accused the opportunity to offer his own testimony. Like the truthfulness of other witnesses, the defendant's veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination." (*Id.* at p. 52 [107 S.Ct. at p. 2709].)

█ The criminal defendant's constitutional right to testify is unlike other matters of trial strategy which are in the control of defense counsel. A criminal defendant has the right to take the stand even over the objections of his trial counsel. As our Supreme Court explained in *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]: "[T]he right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. [Citation.] The defendant's insistence upon testifying may in the final analysis be harmful to his case, but the right is of such importance that every defendant should have it in a criminal case." (Fn. omitted; see also *Wright* v. *Estelle* (5th Cir. 1978) 572 F.2d 1071, 1078-1079 (dis. opn. of Godbold, J.) [the defendant's "desire to tell 'his side' in a public forum may be of overriding importance to him. . . . [¶] . . . [¶] . . . The wisdom or unwisdom of the defendant's choice does not diminish his right to make it."].)

### B.  *An Attorney's Obligation Not to Present Perjured Testimony*

A problem arises, as in this case,[6] where the defendant asserts his right to testify and his attorney knows or suspects the defendant will give perjured

---

[6]On appeal, Johnson points out that his defense counsel referred only to having an "ethical conflict" about calling him as a witness and never stated he believed Johnson would commit perjury. This is true. However, Johnson is unable to suggest any other ethical conflict which might have prevented his attorney from calling him as a witness. Nor can we hypothesize any

testimony. A conflict then arises between the defendant's constitutional right to testify (and his Sixth Amendment right to the assistance of counsel) and the attorney's ethical obligation not to present perjured testimony.

Attorneys have long been prohibited by the attorney rules of professional conduct from participating in the presentation of perjured testimony. (See *Nix* v. *Whiteside* (1986) 475 U.S. 157, 166 [106 S.Ct. 988, 994, 89 L.Ed.2d 123], noting the first rule of professional conduct adopted by the American Bar Association in 1908, canon 32, prohibited an attorney from rendering "any service or advice involving disloyalty to the law" and that canon 37 of the 1928 rules provided an exception to the attorney rule of confidentiality when the client announced an intention to commit a crime.)

The California Rules of Professional Conduct require an attorney to "employ, for the purpose of maintaining the causes confided to the [attorney] such means only as are consistent with truth" and prohibits him from seeking "to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law." (Rules Prof. Conduct, rule 5-200.) The Business and Professions Code echoes the California Rules of Professional Conduct, which are made binding on all members of the California State Bar. (Bus. & Prof. Code, § 6077.) Business and Professions Code section 6068, inter alia, provides: "It is the duty of an attorney . . . [¶] . . . [¶] [t]o employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."

The American Bar Association's Model Code of Professional Responsibility (hereafter Model Code),[7] disciplinary rule DR 7-102(A)(4) provides: "In his representation of a client, a lawyer shall not . . . [k]nowingly use perjured testimony or false evidence."

The American Bar Association's Model Rules of Professional Conduct (hereafter Model Rules), rule 3.3 provides:

"(a) A lawyer shall not knowingly:

---

other ethical conflict. Further, it seems apparent that the court made its ruling on the basis the attorney's "ethical conflict" was that Johnson would commit perjury. We proceed on that assumption.

[7] The American Bar Association has issued both a Model Code of Professional Responsibility and Model Rules of Professional Conduct. The older Model Code was adopted by the American Bar Association in 1969. The Model Rules were adopted in 1983. (See Silver, *Truth, Justice, and the American Way: The Case Against the Client Perjury Rules* (1994) 47 Vand. L.Rev. 339, 343-350 [tracing the development of the Model Code and Model Rules].) Most states (although not California) have adopted either the Model Code or Model Rules. (See Thompson, *The Attorney's Ethical Obligations When Faced with Client Perjury* (1991) 42 S.C. L.Rev. 973, 994 (appen.).)

"(1) make a false statement of material fact or law to a tribunal;

"(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

". . . . . . . . . . . . . . . . . .

"(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

"(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6 [generally preventing an attorney from disclosing confidential information from his client].

"(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false. . . ."

### C. *Solutions to the Problem of a Client's Intended Perjury*

There has been much scholarly discussion of what an attorney should do when faced with a client who intends to commit perjury. Solutions range from the attorney providing full cooperation to his client in presenting the testimony to the attorney refusing to permit his client to testify. Intermediate solutions include persuading the client to not testify falsely, disclosing the perjurious intent to the court, making a motion to withdraw, or allowing the defendant to testify in a "free narrative" fashion. We examine these various options.

### 1. *Full Cooperation With Presenting Defendant's Testimony Even When Defendant Intends to Commit Perjury*

Professor Freedman argues an attorney should fully cooperate with putting on his client's testimony even when the client intends to commit perjury. (See Freedman, *Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions* (1966) 64 Mich. L.Rev. 1469; Freedman, *Understanding Lawyers' Ethics* (1990), excerpt reprinted in Zitrin & Langford, Legal Ethics in the Practice of Law (The Michie Co. 1995) pp. 280-282; see also Silver, *Truth, Justice, and the American Way: The Case Against the Client Perjury Rules, supra,* 47 Vand. L.Rev. 339, 424-426, advocating counsel conduct the defense as if he believed the defendant.) Professor Freedman argues the importance of client confidentiality and, as

well, the attorney's duty to provide effective representation by gathering all necessary information are more important than an attorney's duty to be candid with the court. Therefore, Professor Freedman argues defense counsel must sometimes permit his client to commit perjury and be prepared to argue the client's perjurious testimony to the jury.

No court has endorsed this view. Freedman's approach has also been much criticized by the legal commentators because it conflicts with legal ethics rules prohibiting an attorney from knowingly participating in presenting perjured testimony as well as rules requiring an attorney to disclose a client's intention to commit a crime. (See, e.g., Collett, *Understanding Freedman's Ethics* (1991) 33 Ariz. L.Rev. 455; Lefstein, *Client Perjury in Criminal Cases: Still in Search of an Answer* (1988) 1 Geo. J. Legal Ethics 521, 524-525.) One commentator has stated, "Freedman's approach may seem practical. However, in practice, a lawyer's use of this approach may likely end in disciplinary action." (Note, *Criminal Defendant Perjury: A Lawyer's Choice Between Ethics, the Constitution, and the Truth* (1994) 28 New Eng. L.Rev. 881, 905.)[8]

### 2. *Persuading the Client Not to Commit Perjury*

All the legal commentators agree that when faced with a client who indicates he will commit perjury, an attorney should first attempt to persuade the client to testify truthfully.[9] The United States Supreme Court has held an attorney acted consistently with professional rules of ethics and did not deny the defendant the right to effective assistance of counsel by persuading the defendant not to commit perjury. (*Nix* v. *Whiteside, supra,* 475 U.S. 157, 169 [106 S.Ct. 988, 995] [". . . at a minimum the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct"].)

The persuasion solution, when it succeeds, is the ideal solution since it involves neither the presentation of perjured testimony nor disclosure of client confidences. Yet, it does not answer the question of what should be done when the client insists on testifying falsely despite his attorney's best efforts to dissuade him.

---

[8]Criminal prosecution is also possible. (See Pen. Code, § 127 [subornation of perjury]; *Sheriff, Clark County* v. *Hecht* (1985) 101 Nev. 779 [710 P.2d 728] [attorney could properly be tried for subornation of perjury based on his advising his client to falsely testify he did not remember a material fact].)

[9]See, e.g., Rutherglen, *Dilemmas and Disclosures: A Comment on Client Perjury* (1992) 19 Am. J. Crim. L. 267, 268; Note, *Symposium on Professional Responsibility* (1992) 42 S.C. L.Rev. 973, 989; Zitrin & Langford, Legal Ethics in the Practice of Law, *supra,* page 281.

### 3. *Withdrawal From Representation*

The Model Rules and Model Code provide an attorney should make a motion to withdraw from representation when the representation will result in a violation of law or rules of professional conduct. (Model Rules, rule 1.16(a)(1); Model Code, DR 2-110(B)(2); Rules Prof. Conduct, rule 3-700(B)(2), (C)(1)(b) & (c).)[10] In the California case of *People v. Brown* (1988) 203 Cal.App.3d 1335, 1339-1340, footnote 1 [250 Cal.Rptr. 762], the court, in reliance on the California ethical rules for attorneys,[11] stated that if an attorney is unable to dissuade his client from committing perjury, "the attorney must make a motion to withdraw so as to not give implied consent to the use of perjurious testimony." The court stated, "When faced with a criminal defendant who insists on testifying perjuriously, it is clearly appropriate under California law, even necessary, for counsel to present a request to withdraw to the court." (*Id.* at p. 1339, fn. omitted.)

This approach, while it protects the attorney's interest in not presenting perjured testimony, does not solve the problem. The court may deny the motion to withdraw. (See *People v. Brown, supra,* 203 Cal.App.3d 1335,

---

[10]Model Rules, rule 1.16(a)(1) provides, in pertinent part, "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if: [¶] (1) the representation will result in violation of the rules of professional conduct or other law." Model Code, disciplinary rule DR 2-110(B)(1) provides, a lawyer "shall withdraw from employment . . . if: [¶] . . . [¶] (2) He knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule." California Rules of Professional Conduct, rule 3-700(B) provides: an attorney "representing a client before a tribunal shall withdraw from employment with the permission of the tribunal, if required by its rules, and a member representing a client in other matters shall withdraw from employment if: [¶] . . . [¶] (2) the [attorney] knows or should know that continued employment will result in violation of these rules or of the State Bar Act . . . ." Rule 3-700(C), in pertinent part, provides: "If rule 3-700(B) is not applicable, [an attorney] may not request permission to withdraw in matters pending before a tribunal, and may not withdraw in other matters, unless such request or such withdrawal is because: [¶] (1) The client [¶] . . . [¶] (b) seeks to pursue an illegal course of conduct, or [¶] (c) insists that the member pursue a course of conduct that is illegal or that is prohibited under these rules or the State Bar Act."

[11]The *Brown* court cited former rule 2-111(B) (see now rule 3-700(B)) of the California Rules of Professional Conduct which then provided: "A member of the State Bar representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, . . . if [¶] . . . [¶] [h]e knows or should know that his continued employment will result in violation of these Rules of Professional Conduct or of the State Bar Act . . . ." *Brown* also cited former rule 2-111(C) (now rule 3-700(C)) which then provided "that an attorney *may* request permission to withdraw if his client personally seeks to pursue an illegal course of conduct or insists that the attorney pursue an illegal course of conduct." The *Brown* court also cited Business and Professions Code sections 6068, subdivision (d) (duty of an attorney to maintain such defenses only as appear to him or her legal or just) and 6128, subdivision (a) (misdemeanor for an attorney to commit deceit or collusion or consent to any deceit or collusion, with intent to deceive the court or any party). (*People v. Brown, supra,* 203 Cal.App.3d 1335, 1339.)

1340-1342.) Even if the motion to withdraw is granted, the problem remains. As the court stated in *People* v. *Gadson* (1993) 19 Cal.App.4th 1700, 1710, footnote 5 [24 Cal.Rptr.2d 219]: "[W]e note that permitting defense counsel to withdraw does not necessarily resolve the problem. That approach could trigger an endless cycle of defense continuances and motions to withdraw as the accused informs each new attorney of the intent to testify falsely. Or the accused may be less candid with his new attorney by keeping his perjurious intent to himself, thereby facilitating the presentation of false testimony. Lastly, there is the unfortunate possibility that the accused may find an unethical attorney who would knowingly present and argue the false testimony. Thus, defense counsel's withdrawal from the case would not really solve the problem created by the anticipated perjury but, in fact, could create even more problems."[12]

One court has described the withdrawal solution as an "ostrich-like approach" which does little to resolve the problem.[13]

### 4. *Disclosure to the Court*

Another alternative is that the attorney should disclose the perjury to the court. Initially, we note that some of the other proposed solutions involve some disclosure, i.e., implicit in solutions of making a motion to withdraw or having the defendant testify in a narrative manner is, at least, an implicit disclosure to the court that the attorney believes the defendant may commit perjury. Disclosure has been criticized because it compromises the attorney's ethical duty to keep client communications confidential[14] and results in a significant conflict of interest between the attorney and his client if the attorney discloses to the court that the defendant has perjured himself. (See Silver, *Truth, Justice, and the American Way: The Case Against the Client Perjury Rules, supra,* 47 Vand. L.Rev. 339, 415-418.) Additionally, until the defendant actually takes the stand and testifies falsely, there is always a

---

[12]Even in *People* v. *Brown, supra*, 203 Cal.App.3d 1335, where the court stated an attorney faced with client perjury must make a motion to withdraw, the court recognized withdrawal is an inadequate solution. The court noted: "A criminal defendant cannot be allowed to bring the judicial system to a halt, and endlessly avoid trial by using the simple expedient of informing defense counsel on the eve of trial that he or she intends to commit perjury at trial, thereby requiring counsel to move to withdraw, the court to grant the motion and continue the trial to allow the new counsel to prepare." (*Id.* at p. 1340.)

[13]*People* v. *Salquerro* (1980) 107 Misc.2d 155, 157-158 [433 N.Y.S.2d 711, 713]: "If the motions to withdraw and recuse are granted, substitution of court and counsel, unaware of the possibility of perjury, may overtly facilitate, or appear to condone, a fraud upon the court. Such substitution procedures would effectively cloak the problem; however, this ostrich-like approach would do little to resolve it."

[14]See Model Code, canon 4; Model Rules, rule 1.6; Business and Professions Code section 6068, subdivision (e).

chance the defendant will change his mind and testify truthfully.[15] Finally, disclosure is only a partial solution. If the disclosure occurs before the defendant has taken the stand, the disclosure will require some additional action, i.e., a decision as to whether the defendant's statement is, in fact, false and a further decision whether the defendant will be permitted to testify and in what form and manner. Disclosure before the defendant testifies could result in a mini-trial on the perjury issue before the defendant has had the opportunity to take the stand and testify truthfully.

## 5. *The Narrative Approach*

Under the narrative approach, the attorney calls the defendant to the witness stand but does not engage in the usual question and answer exchange. Instead, the attorney permits the defendant to testify in a free narrative manner. In closing arguments, the attorney does not rely on any of the defendant's false testimony.

In the early 1970's, the American Bar Association adopted the narrative approach in its Project on Standards for Criminal Justice, Standards Relating to the Defense Function. Standard 7.7 provided:

"Testimony by the defendant.

"(a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely.

"(b) If, before trial, the defendant insists that he will take the stand to testify falsely, the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary.

"(c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, the lawyer may not lend his aid to the perjury. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not

---

[15]For example, in *Nix* v. *Whiteside, supra,* 475 U.S. 157, the defendant told his attorney he would testify falsely about one matter, but once on the stand the defendant testified truthfully.

later argue the defendant's known false version of facts to the jury as worthy of belief and he may not receive or rely upon the false testimony in his closing argument." (See *People* v. *Guzman* (1988) 45 Cal.3d 915, 944, fn. 8 [248 Cal.Rptr. 467, 755 P.2d 917].)

This standard, adopting the free narrative approach "was not included in the 1980 second edition of the ABA Standards for Criminal Justice (hereafter ABA Standards). The editorial note to that edition explained, 'the question of what should be done in situations dealt with by the standard has been deferred until the ABA Commission on Evaluation of Professional Standards reports its final recommendations.' In the 1983 Model Rules of Professional Conduct, standard 7.7 was rejected by rule 3.3 (lawyer has duty to disclose falsity of evidence, even if disclosure compromises client confidences.)" (*People* v. *Guzman, supra,* 45 Cal.3d 915, 944, fn. 8.)

The narrative approach has been criticized on the basis the attorney participates in committing a fraud on the court. (See *Stephenson* v. *State* (1992) 206 Ga.App. 273, 275 [424 S.E.2d 816, 818, fn. 1] [appellant's "suggestion he should have been permitted to testify in narrative form would constitute the attorney's participation in fraud, and thus is no answer"].) The narrative approach has also been criticized as communicating to the jury that the defendant is committing perjury. One court has stated, "This procedure could hardly have failed to convey to the jury the impression that the defendant's counsel attached little significance or credibility to the testimony of the witness, or that the defendant and his counsel were at odds. Prejudice to the defendant's case by this trial tactic was inevitable." (*State* v. *Robinson* (1976) 290 N.C. 56, 67 [224 S.E.2d 174, 180].)[16] Another commentator has stated: "by telegraphing her own belief in the inveracity of the accused, the defendant's lawyer arguably violates the ethical prohibitions against counsel serving as a witness and against expressing a personal opinion about the client's 'credibility . . . or . . . guilt or innocence' and also contravenes the evidentiary restrictions on opinion evidence and on testimony presented without oath or affirmation or the laying of a proper foundation." (Silver, *Truth, Justice, and the American Way: The Case Against the Client Perjury Rules, supra,* 47 Vand. L.Rev. 339, 422, fns. omitted.)

### 6. *Refusing to Permit the Defendant to Testify*

The opposite extreme from Professor Freedman's solution of full cooperation by the attorney in presenting the defendant's testimony is a refusal to

---

[16]See also *Nix* v. *Whiteside, supra,* 475 U.S. 157, 166, 170-171 and footnote 6 [106 S.Ct. 988, 994-996], expressing some skepticism of the narrative approach where the attorney plays a "passive role . . . in allowing perjury to be presented without challenge" but specifically declining to hold what course of conduct an attorney should follow when faced with a client who intends to commit perjury.

permit the defendant to testify at all. This solution is justified by the theory that an attorney has an ethical obligation not to participate in the presentation of perjured testimony and the defendant has no right to commit perjury. (See *United States* v. *Curtis* (7th Cir. 1984) 742 F.2d 1070, 1076; *Stephenson* v. *State, supra,* 206 Ga.App. 273, 275 [424 S.E.2d 816, 818].)

Preclusion of the testimony as a solution has been criticized because it essentially substitutes defense counsel for the jury as the judge of witness credibility; it puts the determination of whether the defendant is telling the truth or a lie into the hands of defense counsel. (See Rifkin, *The Criminal Defendant's Right to Testify: The Right to Be Seen But Not Heard* (1989) 21 Colum. Hum. Rts. L.Rev. 253, 272.) Further, under this approach, a determination is made that the defendant will commit perjury before he has even taken the witness stand. As we noted before, until the defendant is actually on the stand, there is always the possibility the defendant will change his mind and testify truthfully. (See, e.g., *Nix* v. *Whiteside, supra,* 475 U.S. 157 [defendant told his attorney he would testify falsely, but once on the stand, he testified truthfully].) Further, a determination of whether the defendant will commit perjury may result in a mini-trial, with the attorney essentially "testifying" against the defendant. Finally, this approach, while safeguarding the attorney's ethical obligations not to participate in presenting perjured testimony, results in a complete denial of the defendant's right to testify.

### 7. California Cases

Two California cases, *People* v. *Guzman, supra,* 45 Cal.3d 915 and *People* v. *Gadson, supra,* 19 Cal.App.4th 1700, in the context of ineffective assistance of counsel claims, have expressly approved use of the narrative approach.

In *Guzman,* defense counsel, outside the presence of the jury, informed the court that the defendant, charged with murder, would be testifying against his advice and in a free narrative fashion. The court advised the defendant to follow his attorney's advice and warned him of the drawbacks of testifying.[17] The defendant elected to testify and testified in a narrative fashion. Defense counsel did not argue defendant's testimony to the jury although defendant's second counsel referred to some of the defendant's testimony.

---

[17]"The court advised defendant that (i) he should follow his attorney's advice and not testify, (ii) his testimony would be subject to evidentiary objections under the same rules of evidence as any other witness and that he was ill-equipped to handle those objections because of his inexperience in law, (iii) his failure to testify would not cure any failure by the People to prove essential elements of the crimes charged beyond a reasonable doubt, and (iv) he had a constitutional right not to testify and no adverse inference could be drawn from his decision to exercise that right.

The defendant argued use of the free narrative approach resulted in a denial of his right to the effective assistance of counsel. He contended "counsel improperly failed to elicit his version of the facts, and [contended] that questions from counsel would have ensured a more complete and coherent presentation. Further, he argue[d], his attorney-client privilege was violated. Finally, [he contended] his attorney's approach was the product of a conflict of interest resolved against him." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 942, fn. omitted.) The *Guzman* court rejected these arguments.

The *Guzman* court first concluded neither the United States Supreme Court nor the California Rules of Professional Conduct prohibited use of the narrative approach. (*People* v. *Guzman, supra,* 45 Cal.3d 915, 944.) The court observed, "Counsel's conduct in this case closely followed that formerly prescribed by the American Bar Association (ABA) Project on Standards for Criminal Justice, Standards Relating to the Defense Function (Approved Draft 1971) standard 7.7. The standard recognizes that, although counsel need not elicit what he thinks will be perjured testimony, an accused has an absolute right to testify over counsel's objection." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 944, fn. omitted.) The court noted that the approach taken "was counsel's best effort to reconcile their duty of representation with their ethical obligations as officers of the court." (*Id.* at p. 945.) The court, citing *Lowery* v. *Cardwell* (9th Cir. 1978) 575 F.2d 727, also noted that there had also been approval of the " 'passive refusal to lend aid to what is believed to be perjury' " as is done in the narrative approach. (*People* v. *Guzman, supra,* 45 Cal.3d 915, 945-946.)

The *Guzman* court rejected the defendant's argument the jury had "clear notice that his counsel did not believe him," explaining: "None of this, however, is inconsistent with the jury surmising that defendant desired to testify unhampered by the traditional question and answer format. In fact, defendant's testimony was presented in as clear and coherent a fashion as that of other witnesses. Unlike *Lowery*, counsel's conduct in no way signalled to the jury that they disbelieved their client." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 946.)

Finally, the *Guzman* court rejected the defendant's argument he had been improperly forced to represent himself, i.e., that "by using the free narrative

"When defendant still insisted on testifying, the court further instructed him as follows: (i) if he had any prior felonies bearing on his credibility, the prosecution could use them to impeach him, (ii) the court would instruct the jury on how to weigh the credibility of a witness, (iii) the court would be inclined to instruct the jury that an adverse inference can be drawn against a defendant if he fails to explain or deny any evidence against him introduced by the prosecution that he can reasonably be expected to deny or explain (CALJIC No. 2.62), and (iv) defendant's attorney would have an ethical obligation not to argue to the jury anything in defendant's testimony that the attorney believed was untrue." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 941-942.)

he waived his right to counsel, but that the waiver was neither knowing nor intelligent because the court did not inform him that the jury was likely to infer he was lying." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 946.) The *Guzman* court responded: The defendant had been "'forced' to represent himself only with respect to his own direct testimony"; otherwise counsel had been available and participated in the trial and therefore warnings about self-representation were not necessary; the court had expressly advised the defendant of the dangers of the free narrative approach; and defendant had "understood the dangers and had time to consider them before he insisted on testifying." (*Ibid.*)

In *People* v. *Gadson, supra,* 19 Cal.App.4th 1700, defense counsel informed the court that the defendant would be testifying against his advice and would call two witnesses. The court advised the defendant he would be "'allowed to testify in a free-flow narrative way'" and noted the drawbacks of presenting such testimony.[18] (*Id.* at p. 1705.) The defendant indicated he understood and wanted to testify and present the witnesses. He did so. The court allowed both defense counsel and the defendant to present closing argument. On appeal, the defendant contended he was denied effective assistance of counsel because his defense counsel acceded to his requests to testify and call witnesses. He contended he was forced to represent himself although he had not requested to do so.

The *Gadson* court rejected the defendant's arguments, noting "[i]t is well settled that a criminal defendant has an absolute right to testify over the objection of trial counsel"; "[i]t is also equally well settled that a defense counsel's refusal to participate in the presentation of perjurious testimony from the accused does not deny the client effective assistance of counsel [citing *Nix* v. *Whiteside, supra,* 475 U.S. at p. 171 [106 S.Ct. at p. 996]]"; and that "neither of those precedents nor the California Rules of Professional Conduct state the appropriate course of action if defense counsel believes the client will lie and the client insists on the right to testify." (*People* v. *Gadson, supra,* 19 Cal.App.4th 1700, 1710, fn. omitted.)

The *Gadson* court, after reviewing the *Guzman* case, which had found no ineffective assistance of counsel in use of the narrative approach, concluded,

---

[18]The court noted that the defendant and his witnesses could be impeached with prior felony convictions, subject to the rules of admissibility, advised the defendant to follow his attorney's advice but stated the defendant had a constitutional right to testify, and told the defendant that because his counsel would not be conducting a question-and-answer examination of the defendant and his two witnesses, there was a possibility the jury would draw a conclusion defense counsel did not believe defendant or his witnesses. Finally, the court advised the defendant it believed the defendant was "making a mistake." (*People* v. *Gadson, supra,* 19 Cal.App.4th 1700, 1705-1706.)

"The solution employed [i.e., the narrative approach] properly reconciled the competing interests which intersected in this situation. Defendant was able to testify on his own behalf; trial counsel refrained from actively participating in the presentation of false testimony; defendant was still afforded the assistance of trial counsel; and the integrity of the adversarial system of justice was not compromised." (*People* v. *Gadson, supra,* 19 Cal.App.4th 1700, 1711.)

### 8. *The Narrative Approach Represents the Best Accommodation of the Competing Interests*

■ None of the approaches to a client's stated intention to commit perjury is perfect. Of the various approaches, we believe the narrative approach represents the best accommodation of the competing interests of the defendant's right to testify and the attorney's obligation not to participate in the presentation of perjured testimony since it allows the defendant to tell the jury, in his own words, his version of what occurred, a right which has been described as fundamental, and allows the attorney to play a passive role.

In contrast, the two extremes—fully cooperating with the defendant's testimony and refusing to present the defendant's testimony—involve no accommodation of the conflicting interests; the first gives no consideration to the attorney's ethical obligations, the second gives none to the defendant's right to testify. The other intermediate solutions—persuasion, withdrawal and disclosure—often result in no solution, i.e., the defendant is not persuaded, the withdrawal leads to an endless chain of withdrawals and disclosure compromises client confidentiality and typically requires further action.

We disagree with those commentators who have found the narrative approach necessarily communicates to the jury that defense counsel believes the defendant is lying. As was pointed out in *Gadson*, the jury may surmise the "defendant desired to testify unhampered by the traditional question and answer format." (*People* v. *Guzman, supra,* 45 Cal.3d 915, 946.) Because the defendant in a criminal trial is not situated the same as other witnesses, it would not be illogical for a jury to assume that special rules apply to his testimony, including a right to testify in a narrative fashion. We do not believe the possibility of a negative inference the defendant is lying should preclude the use of the narrative approach since the alternative would be worse, i.e., the attorney's active participation in presenting the perjured testimony or exclusion of the defendant's testimony, neither of which strikes a balance between the competing interests involved.

The danger that the defendant may testify falsely is mitigated by the fact that the defendant is subject to impeachment and can be cross-examined just

like any other witness. The jury is no less capable of assessing the defendant's credibility than it is of any other witness. As the Supreme Court stated in *Rock* v. *Arizona, supra,* 483 U.S. 44, 52 [107 S.Ct. 2704, 2709]: "Like the truthfulness of other witnesses, the defendant's veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination." Further, to preclude the defendant's testimony entirely based on a possibility that defendant may lie, deprives the jury of making that assessment and may deprive the jury of hearing other, nonperjurious evidence to which the defendant would have testified about had he been given the opportunity. In utilizing the narrative approach, the jury has the benefit of hearing the defendant's version.

The narrative approach also avoids having a pre-perjury hearing, a mini-trial on whether the defendant might commit perjury if called to the stand; a hearing which could result in the attorney testifying against the client and which would require the court to be able to see into the future and determine that an individual who has stated only an intention to testify falsely (at least as according to his attorney) will actually testify falsely once on the witness stand.

We further note that not only has the narrative approach received approval in California (*People* v. *Guzman, supra,* 45 Cal.3d 915; *People* v. *Gadson, supra,* 19 Cal.App.4th 1700) but it has also been approved by several other jurisdictions (see *Lowery* v. *Cardwell, supra,* 575 F.2d 727, 731; *Coleman* v. *State* (Alaska 1980) 621 P.2d 869, 881; *State* v. *Waggoner* (1993) 124 Idaho 716, 721-722 [864 P.2d 162, 167-168]; *People* v. *Taggart* (1992) 233 Ill.App.3d 530, 558-559 [174 Ill.Dec. 717, 599 N.E.2d 501, 521]; *Matter of Goodwin* (1983) 279 S.C. 274, 277 [305 S.E.2d 578, 580]; *State* v. *Layton* (1993) 189 W.Va. 470, 484-485 [432 S.E.2d 740, 754-755] [". . . the trial court appropriately weighed the conflicting interests involved and, in this Court's opinion, adopted a procedure which allowed the defendant to testify, which shielded the attorney from unethical and illegal conduct, and which advanced the societal interest in the administration of justice"]; see also *Com.* v. *Jermyn* (1993) 533 Pa. 194, 200 [620 A.2d 1128, 1131]).

We conclude the narrative approach best accommodates the competing interests of the defendant's constitutional right to testify and the attorney's ethical obligations.

### 9. *The Trial Court's Solution*

■ The trial court here followed the solution of excluding the defendant's testimony on the basis counsel had an "ethical conflict" with calling Johnson as a witness because, presumably, Johnson would commit perjury.

The trial court's approach, i.e., of precluding Johnson's testimony based only on his attorney's assertion of an "ethical conflict," attempted an impossible task, i.e., to determine, as a matter of fact, that Johnson would perjure himself once he took the stand. This is an impossible task since there is always the possibility a defendant will be persuaded by counsel's arguments and testify truthfully. Further, the defendant's allegedly false testimony may not be a matter of "perjury" but of having remembered additional details upon further reflection; the change in the defendant's intended story may be the result of an effort to be more truthful. (See *Com.* v. *Alderman* (1981) 292 Pa.Super. 263 [437 A.2d 36, 39] [". . . a defendant may say one thing to his lawyer and later contradict it, when for one reason or another—new information, for example—his memory has been refreshed and he concludes that his first account was mistaken"].)

Moreover, the trial court's approach substitutes the defendant's attorney for the jury as the trier of fact and determiner of witness credibility. As one legal commentator has explained:

"If a criminal defendant has a constitutional right to be heard—to tell his story—it does not make sense to say he may only tell a story that conforms to someone else's view of the truth. Under our system of justice, the factfinder makes credibility determinations. If the defendant has a constitutional right to tell his or her story, that right is to tell it to the jury, so that it may make the ultimate credibility determination.

"Thus, if a defendant has a constitutional right to be heard, it cannot be predicated on counsel's determination that what the jury will hear is the truth. The right to be heard is a personal, fundamental right of the accused, and the lawyer has no right to prevent a client from exercising it." (Rieger, *Client Perjury: A Proposed Resolution of the Constitutional and Ethical Issues* (1985) 70 Minn. L.Rev. 121, 143.)

The trial court's approach precluded the jury from hearing additional evidence, i.e., Johnson's version of the events. While Johnson's version may have been false (at least in part),[19] it is the jury's function to determine the credibility of witnesses. Like other witnesses, Johnson's veracity could have been tested through cross-examination.

Additionally, the trial court's approach did not achieve any balance between the competing interests of the defendant's constitutional right to

---

[19]Based on the record before us, it is impossible to tell whether the attorney believed Johnson's testimony would have been false only as a single matter or would have been completely false.

testify and the attorney's duty not to participate in the presentation of perjury. The trial court's approach completely subordinated the defendant's constitutional right to the attorney's interest. The defendant's right to testify has been described as fundamental and is guaranteed by the constitution. (*Rock* v. *Arkansas, supra,* 483 U.S. 44.) Even under the common law when a criminal defendant was barred from giving sworn testimony, English judges, seeking mitigation of the rule disqualifying defendants from testifying, permitted the defendant to make a statement. As one English judge stated: " 'I would *never* prevent a prisoner from making a statement, though he has counsel. He may make any statement he pleases before his counsel addresses the jury, and then his counsel may comment upon that statement as a part of the case. If it were otherwise, the most monstrous injustice might result . . . .' " (Statement of Baron Alderson, quoted in *Ferguson* v. *Georgia, supra,* 365 U.S. 570, 583 [81 S.Ct. 756, 764].) "The custom grew up in England out of a spirit of fairness to give an accused, who was otherwise disqualified, an opportunity to tell his story in exculpation." (*State* v. *Louviere* (1929) 169 La. 109, 119 [124 So. 188, 192].) It seems particularly unjust at this date, when the defendant's right to give sworn testimony in his own behalf has been recognized as being constitutionally guaranteed, to bar a defendant from telling his story to the jury in his own words based only on an attorney's assertion of an "ethical conflict" in calling the defendant to the stand.

Finally, we note that in California, no statutes, judicial decisions or ethical rules require preclusion of a defendant's testimony when the attorney believes or "knows" a client will commit perjury. California case law has approved of the narrative approach, which avoids the problems of prior factual determinations by defense counsel (and/or the court) that the defendant will commit perjury, allows a defendant to exercise his constitutional right to testify, permits defense counsel to play a passive role and places the factfinding and credibility determinations with the jury as should be the case.

The Attorney General argues the court properly excluded Johnson's testimony and points to language in United States Supreme Court cases[20] stating that while a defendant has a constitutional right to testify, the defendant has no right to commit perjury. (See *Nix* v. *Whiteside, supra,* 475 U.S. 157, 173 [106 S.Ct. 988, 997] ["[w]hatever the scope of a constitutional right to

---

[20]The Attorney General also cites *People* v. *Guzman, supra,* 45 Cal.3d 915, 943 in support, but an examination of *Guzman* reveals that the court was merely outlining the reasoning in *Nix* v. *Whiteside.* Furthermore, as we pointed out previously, *Guzman* approved the use of the narrative approach; *Guzman* did not hold a criminal defendant should be denied a right to testify on the basis he might commit perjury.

testify, it is elementary that such a right does not extend to testifying *falsely*"]; *Harris* v. *New York* (1971) 401 U.S. 222, 225 [91 S.Ct. 643, 645, 28 L.Ed.2d 1] [the right to testify "cannot be construed to include the right to commit perjury"].)

Initially, we note neither of these cases involved a holding that a defendant was properly precluded from testifying because he might commit perjury; in both cases the defendant actually testified. In *Nix* v. *Whiteside*, the defendant testified truthfully. The Supreme Court held the defendant was not denied ineffective assistance of counsel by counsel's conduct in persuading the defendant not to testify falsely, including counsel's threats to withdraw from the case and impeach the defendant if he testified falsely. Nothing in the *Nix* v. *Whiteside* case provides that a court must prohibit a defendant from testifying if his attorney states a belief or knowledge the defendant will testify falsely if called to the stand. Indeed, as noted by our Supreme Court in *People* v. *Guzman, supra,* 45 Cal.3d 915, 944, *Nix* v. *Whiteside* did not prescribe any particular course which should be followed by a California lawyer when faced with a defendant who has stated an intention to commit perjury.

Similarly, in *Harris* v. *New York*, the issue was not whether a defendant should be prohibited from testifying based upon his attorney's belief or knowledge the defendant might commit perjury. *Harris* involved the issue of whether a defendant who elected to testify could be impeached with prior inconsistent statements taken in violation of his *Miranda*[21] rights. In the course of so holding, the Supreme Court stated:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that *privilege cannot be construed to include the right to commit perjury.* [Citations.] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Harris* v. *New York, supra,* 401 U.S. 222, 225-226 [91 S.Ct. 643, 645-646], italics added, fn. omitted.)

Taken in context, it is clear the Supreme Court in *Harris* v. *New York* was not holding a criminal defendant should be denied his right to testify based

---

[21]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

on his attorney's belief he might commit perjury. *Harris* v. *New York* held only that *Miranda* may not be used as a shield to commit perjury: A defendant who testifies is subject to impeachment and cross-examination with prior inconsistent statements, including statements taken in violation of *Miranda*.

In sum, neither of these cases holds a trial court should (as did the trial court here) deny a defendant his constitutional right to testify based on the possibility or probability the defendant might commit perjury. Rather, the Supreme Court held that a defendant is not denied effective assistance of counsel when his counsel persuades him not to testify falsely and that once a defendant elects to testify, he is subject to cross-examination and impeachment, including with statements taken in violation of his *Miranda* rights.

We conclude the trial court erred in denying Johnson his constitutional right to testify. The trial court should have followed the narrative approach, which has been approved by the courts in California and which would have best accommodated the conflicting interests of Johnson and his defense counsel.

### D. *Standard of Reversal*

▬ Johnson argues that the court's error in denying his right to testify requires reversal per se. We disagree.

While the 1987 case of *People* v. *Harris* (1987) 191 Cal.App.3d 819, 823 [236 Cal.Rptr. 680], states reversal is required whenever a defendant is improperly denied his right to testify, we note a more recent case from this court, *People* v. *Hayes* (1991) 229 Cal.App.3d 1226 [280 Cal.Rptr. 578] has stated, albeit as dicta, that the *Chapman*[22] harmless error analysis should apply.

In *People* v. *Hayes, supra*, 229 Cal.App.3d 1226, 1234, footnote 11, we stated: "Most errors do not mandate automatic reversal. (See *People* v. *Lee* (1987) 43 Cal.3d 666, 674-676 [238 Cal.Rptr. 406, 738 P.2d 752] [aside from errors which abort the basic trial process, strong presumption that errors tested under *Chapman*].) Other courts which have examined identical claims have tested the error under the 'harmless beyond a reasonable doubt' standard enunciated by *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (See *Ortega* v. *O'Leary* (7th Cir. 1988) 843 F.2d 258, 262-263 [denial of right to testify

---

[22]*Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].

tested under *Chapman*]; *Alicea* v. *Gagnon* (7th Cir. 1982) 675 F.2d 913, 925-926 [error in preventing defendant from testifying based on noncompliance with 'alibi-notice' statute tested under *Chapman*]; *Wright* v. *Estelle* (5th Cir. 1977) 549 F.2d 971, affd. 572 F.2d 1071 (in bank).) The Supreme Court has tested analogous claims under a harmless error standard. (See *Crane* v. *Kentucky* (1986) 476 U.S. 683, 691 [90 L.Ed.2d 636, 645-646, 106 S.Ct. 2142] [harmless error test applied to erroneous exclusion of defense evidence].)"

Our research has revealed additional cases which have applied the *Chapman* harmless error analysis to a denial of the defendant's right to testify. (See *U.S.* v. *Taylor* (7th Cir. 1997) 128 F.3d 1105, 1109; *State* v. *Silva* (1995) 78 Hawaii 115, 125 [890 P.2d 702, 712], overruled on other grounds in *Tachibana* v. *State* (1995) 79 Hawaii 226, 235-236 [900 P.2d 1293, 1302-1303]; *People* v. *Solomon* (*Am. Op.*) (1996) 220 Mich.App. 527, 535 [560 N.W.2d 651, 655]; *State* v. *Flynn* (1994) 190 Wis.2d 31, 53-57 [527 N.W.2d 343, 353]; see also *U.S.* v. *Tavares* (D.C. Cir. 1996) 100 F.3d 995, 999 [321 App.D.C. 381] [no reasonable probability testimony would have changed the verdict, standard for ineffective assistance of counsel claim]; *Commissioner of Correction* v. *Rodriquez* (1992) 222 Conn. 469, 478 [610 A.2d 631, 636, fn. 9], overruled on other grounds in *Simms* v. *Warden* (1994) 229 Conn. 178 [640 A.2d 601]; but see *State* v. *Rosillo* (Minn. 1979) 281 N.W.2d 877, 879; *Hernandez* v. *Dugger* (M.D.Fla. 1992) 829 F.Supp, 372, 376-377 [finding defect "structural"].)

█ The Supreme Court has explained ". . . the harmless-error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 308 [111 S.Ct. 1246, 1264, 113 L.Ed.2d 302].) The Supreme Court has further stated, constitutional violations which are subject to harmless-error analysis are errors that "occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (*Id.* at pp. 307-308 [111 S.Ct. at p. 1264].) Under the *Chapman* harmless error test, a violation of a defendant's constitutional right does not require reversal when it can be shown beyond a reasonable doubt that a "trial error" (as opposed to "structural defects in the constitution of the trial mechanism") did not contribute to the guilty verdict. (*Id.* at p. 309 [111 S.Ct. at p. 1265]; *Chapman* v. *California, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

■ We agree with those cases which have held the denial of the defendant's right to testify is a "trial error." Such an error, resulting in exclusion of evidence, is not reversible per se but subject to the *Chapman* harmless error analysis. Accordingly, we review the record to determine if the error in not permitting Johnson to testify was harmless beyond a reasonable doubt.

Here, Johnson concedes the evidence was generally overwhelming[23] except as to one particular count which we address in the unpublished part and find the evidence strongly supports conviction on that count. Johnson does not argue the exclusion of his testimony was prejudicial or that his testimony might have changed the verdict. Johnson argues for reversal per se which we have rejected.

We agree with Johnson that the evidence was overwhelming. Not only was there a distinctive modus operandi involved in the assaults against six of the victims (i.e., attacking victims very late at night, forcing them back into their cars, directing them to drive to a location only a few blocks away, sexually assaulting the victims in the backseat, and demanding money) but also there was strong DNA and fingerprint evidence as well as blood, hair and lineup evidence connecting Johnson to these crimes. Additionally, there was strong evidence, both medical and by persons who observed the victims shortly after the attacks, establishing the victims had been forcibly raped and sodomized rather than had engaged in consensual sex. Further, here there was no offer of proof as to what Johnson would have testified about. Thus, we have before us no evidence which could support a finding that Johnson was harmed by exclusion of his testimony; any such finding would necessarily be based on mere speculation. (Cf. *U.S.* v. *Taylor, supra*, 128 F.3d 1105, 1109 [omission of description of what defendant's testimony would have been "coupled with the overwhelming evidence of [his] guilt, establishes that any error causing him not to testify was harmless beyond a reasonable doubt"]; but see *State* v. *Silva, supra*, 78 Hawaii 115, 126 [890 P.2d 702, 713] [error held not harmless beyond a reasonable doubt, noting the record did not indicate to what the defendant would have testified].)

We conclude that while the trial court erred in precluding Johnson from testifying, based on the record we have before us on appeal, the error was harmless beyond a reasonable doubt.

---

[23]Johnson does not argue denial of his testimony was prejudicial. Rather, he argues for a per se standard of reversal and asserts "The error requires reversal of the judgment despite the good faith of the trial court and defense counsel and the seemingly overwhelming evidence of guilt."

II-IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The convictions for simple kidnapping on counts 9, 14, 40, 48 and 67 are reversed and the abstract of judgment should be accordingly amended. The abstract of judgment should also be corrected to stay the consecutive five-year term for count 2 and to stay the Penal Code section 12022.3, subdivision (a) enhancement for count 6. In all other respects, the judgment is affirmed.

Benke, J., and McDonald, J., concurred.

A petition for a rehearing was denied April 22, 1998, and appellant's petition for review by the Supreme Court was denied July 8, 1998. Mosk, J., Kennard, J., and Chin, J., were of the opinion that the petition should be granted.

---

*See footnote 1, *ante*, page 608.