STATE of Wisconsin, Plaintiff-Respondent,

v.

Derryle S. McDOWELL, Defendant-Appellant.†

Court of Appeals

*No. 02–1203-CR. Oral argument June 3, 2003.—
Decided July 22, 2003.*

2003 WI App 168

(Also reported in 669 N.W.2d 204.)

† Petition to review granted 10-21-03.

600

602

606

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher J. Cherella*, of the *Law Offices of Christopher J. Cherella*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Gregory M. Weber*, assistant attorney general.

On behalf of the Wisconsin Association of Criminal Defense Lawyers and Frank J. Remington Center, University of Wisconsin Law School, an amicus curiae was submitted by *John A. Pray* and *Keith A. Findley*, of the *Frank J. Remington Center, University of Wisconsin Law School*, of Madison, WI.

Before Fine, Schudson and Curley, JJ.

¶ 1. SCHUDSON, J. Derryle S. McDowell appeals

from a judgment entered on jury verdicts convicting him of robbery, kidnapping, and five counts of first-degree sexual assault while using a dangerous weapon, all as party to a crime, and from the order denying his motion for postconviction relief. He argues that trial counsel rendered ineffective assistance, effectively abandoning the defense of his case, by abruptly shifting from question-answer questioning to narrative-response questioning during his testimony.

¶ 2. McDowell's appeal presents the important issue of whether, and under what circumstances, a criminal defense attorney may require his or her client to testify in unaided narrative, rather than in the usual question-answer style, in order to avoid complicity in the client's perjury. Resolving this issue, we determine and apply the standards that, we conclude, govern criminal defense counsel's legal obligations in assessing and responding to a client's possible perjurious testimony.

¶ 3. We conclude that defense counsel may not substitute narrative questioning for question-answer questioning unless counsel knows that the client intends to testify falsely. We further conclude that, with only extraordinarily rare exceptions, such knowledge must be based on the client's admission to counsel of the intent to testify falsely. Finally, we conclude that before using narrative questioning, counsel must advise the client and the trial court in order to ensure that the client understands the nature and ramifications of narrative questioning.

¶ 4. In this case, therefore, we conclude that defense counsel performed deficiently in two respects: (1) he shifted to narrative questioning without advising McDowell that he was going to do so; and (2) he used narrative questioning despite believing that

McDowell intended to testify truthfully. We also conclude, however, that under the circumstances of this case, counsel's deficient performance was not prejudicial. Accordingly, we affirm.[2]

## FACTUAL BACKGROUND

### I. The Crimes

¶ 5. On the night of April 21, 1997, an eighteen-year-old woman, on her way home, was followed by two men after she got off a bus. They rushed her and, each with a gun, forced her off the street and down a gangway near a building at 4720 West Burleigh Street in Milwaukee. With guns to her head, they robbed her, fondled her, and repeatedly assaulted her sexually, penetrating her orally and vaginally by both penis and gun barrel. Following the assaults, the victim spat ejaculate at the scene. The victim could not identify her attackers, but the State had a powerful case based on evidence recovered from her body, her clothing, and the scene, including the victim's saliva mixed with semen containing McDowell's DNA. Police also recovered evidence containing DNA of McDowell's accomplice, who pled guilty prior to McDowell's trial.

### II. The First Day of Trial

¶ 6. As soon as McDowell's case was called on the first day of trial, Monday, May 15, 2000, his attorney, Assistant State Public Defender Ronald Langford, in-

---

[2] McDowell also argues that: (1) the trial court erred in denying his request for new counsel; (2) the court presented erroneous jury instructions on the sexual assault counts, thus requiring dismissal of one of them and retrial of the other four; and (3) the court sentenced him based on inaccurate information. For the reasons we will explain, we reject these arguments.

formed the court that McDowell had fired him over the weekend. Contrary to the assumption underlying both parties' briefs to this court, however, neither McDowell nor Mr. Langford requested new counsel, and Mr. Langford did not move to withdraw. The entire record on this point, at this juncture in the case,[3] is brief:

> MR. LANGFORD: Judge, just so the Court is aware, I was fired over the weekend and that is where we stand.
>
> THE COURT: He has no right to fire you. Only I can.
>
> MR. LANGFORD: I understand that. I am just advising the Court that Mr. McDowell has discontinued any efforts to assist, and that is where we are.
>
> THE COURT: Mr. McDowell, you have to understand something. Mr. Langford is an officer of this Court. This matter has been scheduled for trial. This Court is the only one that has the authority to fire him, not you. If you decide you are not going to cooperate, well that is your own situation, but you don't have any rights to fire him. Only I do. And I am telling you . . . he is not going to be fired by this Court.
>
> This Court knows Mr. Langford, knows his abilities, and he is staying on the case. Case is going to trial today. Understand it. You have a right to finality. So do the people of the State of Wisconsin. So do the victims in this case or alleged victims, and that is what is going to happen.

---

[3] The subject arose two more times: (1) just before the defense presented its case; and (2) prior to sentencing. The former will be discussed in this decision; the latter, resulting in appointment of new counsel for sentencing, has no bearing on the issues in this appeal.

So with that happiness aside, I have a motion in limine [unrelated to any issue involving McDowell's representation] before me.

¶ 7. Later, during additional discussions of various pre-trial motions in limine, Mr. Langford commented: "Truth of the matter is, your Honor, in light of my discussion over the weekend with [McDowell], I don't know what the theory of defense is going to be because he made clear he did not want me representing him and he has become unassistive and—" The court then interrupted, declaring:

> Well he must be unassistive long before this past weekend, so let's not get into that. That is hogwash. Let's go. The issue is long before this weekend with the amount of appearances we have had in this court on this case. If we don't have a theory of defense formulated and then whatever little iron[-]outs you have to do, that is different. That is an ongoing process anyway all during trial.

Mr. Langford replied: "No. I understand that, Judge. All I am saying is I don't know if Mr. McDowell intends to cooperate. I don't know if he intends to testify, not testify, what he is going to testify to. I don't know."

¶ 8. The court then advised McDowell that he could decide whether to cooperate with counsel, and concluded: "Obviously if you don't help[,] it obviously hurts your situation perhaps more than it helps it, but that is your call, not mine. Fair enough?" McDowell replied, "Yes." And once again, McDowell said nothing about any problems with counsel; he made no request for new counsel, and Mr. Langford did not move to withdraw. Lacking knowledge of McDowell's theory of defense or testimonial intentions, however, Mr. Lang-

ford advised the court that he would reserve his opening statement until the conclusion of the State's case.

### III. The Last Day of Trial

¶ 9. Two days later, as the trial resumed on the morning after the State rested, the trial court confronted new developments involving McDowell's representation:

> THE COURT: . . . Is there anything you want to bring to the Court's attention prior to us bringing the jury in this case?
>
> MR. LANGFORD: There is, your Honor.
>
> As the Court is aware, we had an off-the-record conversation in chambers,[4] at which time I advised the Court that I had some concerns about testimony that I anticipated being proffered to the Court before this jury this morning. I was not specific as to who the testimony would come from, but I had concerns that would affect my ability to effectively proceed as counsel in this case and asked the Court or suggested to the Court at that time that I would— I be permitted to withdraw.
>
> And that sort of is where we are. I still maintain that position and we have had discussions, however, regarding how to proceed with this matter, and if that is where we go then I accept that as the directive from this Court, but I still have those concerns.

[4] We remind counsel and the court of our concerns about off-the-record discussions. *See Coston v. Joseph P.*, 222 Wis. 2d 1, 7 n.5, 586 N.W.2d 52 (Ct. App. 1998) ("Here, as in all too many cases, the record is seriously deficient and a circuit court's off-the-record informality has undermined the process of appellate review. While we recognize the many temptations to indulge in off-the-record proceedings, we again urge resistance to temptation.").

(Footnote added.) Although Mr. Langford "was not specific," the ensuing discussion implied that his concerns related to the possibility that McDowell would testify untruthfully.

¶ 10. The trial court then addressed several concerns including Mr. Langford's duty to his client and his duty as an officer of the court under Wisconsin's Rules of Professional Conduct for Attorneys. The court then advised that, in its estimation, Mr. Langford could: (1) recommend to McDowell that he not testify if his intended account was untrue, "not supportable," or "so completely outrageous that a trier of fact is not only not going to believe it, [but] is going to . . . hold it against" him; or (2) take the "middle ground" by calling McDowell to testify in narrative form, without the assistance of conventional questioning. The court also acknowledged the option of counsel's withdrawal, but rejected that because of the mistrial that would result, affecting "not only the rights of [McDowell] but the rights of all the other people" involved in the almost-completed jury trial. The court further reasoned that allowing counsel to withdraw was a particularly unattractive option given that it would not necessarily accomplish anything; after all, McDowell's next attorney would face the same dilemma and, therefore, might also ask to withdraw.

¶ 11. Mr. Langford then asked, "First of all, Judge, the Court is denying my motion to withdraw?" The trial court responded, "Absolutely." The court then, however, granted counsel's request for a short break to confer with McDowell. After that break, Mr. Langford advised the court:

> Your Honor, I have spoken with Mr. McDowell. *Mr. McDowell advised me he does wish to testify and that what he would be testifying to will be the absolute truth*

with respect to anything regarding his testimony. He wishes to get up there and testify as to the truth.

. . . .

Judge, *I have no reason to believe in light of what Mr. McDowell has told me that he will not get up there and testify as to the truth.* Therefore when he takes the stand I will be asking him questions, specific questions with respect to his testimony before this jury.

(Emphases added.) The court and counsel then concluded their discussion:

THE COURT: All right. Well that is your right to do, and that is your election as your tactical decision under the circumstances. *Just understand that you also then, should something change during the course of this situation, you shall immediately advise the Court and then only narrative responses will be given on the part of Mr. McDowell, and you shall no longer have any other questions available to you for purposes of specific requests for clarification under the circumstances from the time this Court is advised of that narrative situation.*

Understand that, Mr. Langford?

MR. LANGFORD: Understood, Judge.

(Emphasis added.)

¶ 12. Mr. Langford then presented his opening statement. He told the jury that McDowell would testify that he never assaulted the victim, but that the area where the victim was assaulted was behind the building at 4720 West Burleigh where his father lived. McDowell, Mr. Langford explained, had been in that area the night before the assault, having oral sex with his

614

girlfriend, and had ejaculated. This, Mr. Langford implied, accounted for McDowell's semen at the scene.[5]

¶ 13. As McDowell started testifying, Mr. Langford questioned him in conventional question-answer style, asking three questions about his age and residence. Next, however, Mr. Langford asked, "Mr. McDowell, I want you to look at this jury and tell this jury about the events of April 20 and April 21 of 1997. Take your time and speak loudly and clearly, please." But as McDowell began his answer, Mr. Langford asked, "Do you want a sidebar, Judge?", and the court responded, "I certainly do."

¶ 14. The record reflects that a sidebar conference among counsel and the court then was held off the record.[6] The court then directed Mr. Langford to "re-

---

[5] Mr. Langford's opening statement was relatively short and it provided few details. In postconviction testimony, he explained:

> [T]hat was probably one of the most innocuous openings I made because of my uncertainty as to what exactly was going to come out.
>
> So I gave what I believe[d] was going to the jury, but at the same time not boxing myself in terms of what testimony was actually going to come out because there was a serious concern about what, in fact, was going to be said.

[6] Immediately after the sidebar, the court instructed the jury that it was not to consider the opening statements or closing arguments of counsel as evidence; the court, however, said nothing to the jury directly related to the issue that apparently led to the sidebar conference. The court then, in front of the jury, additionally advised Mr. Langford, "I am reserving your right, by the way, in this matter based upon the Court's previous rulings." As we will explain, a subsequent portion of the record clarifies that this reservation of right related to Mr. Langford's shift to narrative questioning.

state the question," and Mr. Langford asked: "Again, Mr. McDowell, take your time and tell this jury what you would like for them to know regarding the allegations against you beginning with where you were and what you were doing on April 20, 1997, through the early morning hours of April 21, 1997. Proceed, please." McDowell answered:

On April 20, 1997, I was by my father's house at 4720 West Burleigh. Later on in the afternoon I had company. My girlfriend came over sometime in the afternoon. We watched TV. We got movies and ate, joked around, played around. And as the evening went through we continued to watch movies, and I asked my father could I go to the gas station. He told me to take out the garbage before I went to the gas station because I wanted to go to the gas station so me and my girlfriend was cuddled up and I continued to ask did she want to go out in the back with me. And she first continued to tell me no, but afterward she told me yes. So I asked my father can I go to the gas station. He told me to take out the garbage.

Instead of me taking out the garbage, me and Sunshine, my girlfriend, had just went out the door to go to the gas station. That is where we were at. At the gas station we had two sodas and returned back to my father's apartment, 4720, but then we didn't go inside the apartment. We went outside around the back. While we was in the back we was fooling around and had oral sex in the back, and then by the time we had oral sex, after we were through and everything like that, my father ended up coming out in the back bringing out the garbage and caught me and my girlfriend fooling around back there and got yelling and screaming at me and my girlfriend telling us to go in the house. As we went to the house he told my girlfriend to call her mother, and he continued to yell and fuss and everything at us. Her mother wasn't there, so he told her to

616

get ready to take her home. Afterwards she got ready to go and continued fussing, continued to argue at us, and we took her home. And then we came back. First me and my father rode around because he continued to talk to me about what just happened back there, how dangerous it was and how we could have got in trouble and what we was doing was wrong. So we finally arrived back to my father's house. When we arrived we went in the house and went to sleep.

That is what happened according to them days.

Mr. Langford then asked two more questions, eliciting McDowell's acknowledgement that he had four juvenile adjudications. In response to the prosecutor's very brief cross-examination, McDowell admitted that he had attempted to avoid arrest and run from police, and that he was a friend of the accomplice who had been convicted of these assaults. Mr. Langford asked no re-direct questions.[7]

¶ 15. In his closing argument, Mr. Langford picked up the thread of McDowell's implicit theory of defense. After commenting at length on the nature of DNA evidence, he stated:

---

[7] Following the prosecutor's cross-examination, the trial court stated: "All right. There is no redirect allowed under the circumstances of this Court's ruling." The record reveals nothing more on this point and McDowell, while mentioning this ruling in his brief to this court, does not specifically challenge it. Still, as we will explain, the preclusion of re-direct examination would seem to be the logical corollary to the restriction to narrative questioning; after all, re-direct affords counsel the opportunity to use question-answer to help a defendant clarify his or her account. Therefore, we analyze McDowell's challenge to his narrative questioning as encompassing the added preclusion of re-direct.

[T]he thought of living somewhere and not having your DNA somewhere just boggles my mind. . . . Where would you expect to find DNA material of yours? In your house? . . . . Where else would you expect to find your DNA material but around where you in fact live or work or someplace that you frequent? . . . .

There is an expectation that you could find evidence of Mr. McDowell being related and associated with 4720 West Burleigh.

. . . And lo and behold, where Derryle McDowell lives they find a sample, and that is where they say they found the sample and we can't disprove that.

¶ 16. Following the submission of the case to the jury, the trial court and defense counsel provided an account of the off-the-record sidebar that had occurred as Mr. Langford shifted from question-answer to narrative:[8]

THE COURT: Lastly, I did reserve your right. We did have a sidebar shortly before Mr. McDowell's testimony where you, after reconsideration or perhaps even other information being provided to you, decided tactically that you would have him give a narrative statement as opposed to going to specific question and answer, and the only other additional question that was going to be allowed was the issue concerning whether or not you have ever been adjudicated a deli[n]quent

---

[8] We appreciate the trial court's effort to provide a summary of the off-the-record sidebar. Certainly, a court's summary is better than no record at all. Nevertheless, we again remind counsel and the court that such summaries often fall short for appellate purposes. As we have emphasized, "If a matter is significant enough to invite appellate review, it is too important to subject to a remote summation procedure." *State v. Mainiero*, 189 Wis. 2d 80, 95 n.3, 525 N.W.2d 304 (Ct. App. 1994).

618

and if so how many times. I reserved your right to make a record at that time, Mr. Langford.

 MR. LANGFORD: Thank you Judge.

 As the Court is aware, we have been dealing with the issue regarding proposed testimony from defense witness, and I had been conferring with legal counsel from my office. Attorney Deja Vishny, who is our homicide group leader as well as our ethics expert in the office, as well as appellate counsel Bill T[yr]oller [sic], and we had many discussions about that. Subsequent to the initial decision to go ahead and do a question and answer with regards to Mr. [McDowell's] testimony, I did in fact receive an opinion back from Attorney Bill Tyroller [sic], who is both an appellate attorney as well as legal counsel for the agency, advising me that I should go with narrative. *I did in fact advise Mr. Derryle McDowell that that is the way we would be proceeding, and we had already discussed what the narrative entailed prior to, as a result of prior discussions, so he was familiar with what it was that I was advising him that we were going to do in terms of his testimony.* So that was the result of me making a switch from question and answer to the narrative.

 THE COURT: All right. Well the Court has previously allowed you that flexibility in the event you felt it was necessary, and the Court felt it was one of your several options that you had as trial counsel . . . .

(Emphasis added.)

 ¶ 17. McDowell was convicted of all counts and, following several adjournments, sentenced. He moved for postconviction relief, asserting that Mr. Langford had rendered ineffective assistance.

## IV. The *Machner* Hearing[9]

¶ 18. At the *Machner* hearing, Mr. Langford explained what had led to his original concerns about McDowell's anticipated testimony, as well as his shifting approaches to McDowell's trial questioning. Mr. Langford testified that, based on trial-preparation discussions he had had with McDowell and his girlfriend, "Sunshine," he had come to have the "impression" that McDowell had not engaged in any sexual activity behind the building the night before the assaults. Mr. Langford explained that McDowell only introduced the oral-sex-the-night-before theory of defense after learning that any scientific challenge to the DNA evidence would be futile. And, discovering several inconsistencies between the accounts of McDowell and Sunshine, Mr. Langford remained skeptical about the integrity of that theory and ultimately decided that Sunshine should not testify.

¶ 19. Further, Mr. Langford testified that McDowell asked, " 'What if Sunshine and I get together and we say . . .' ", and told him: "[']I'll say what I need [to] say to help myself out and if I have to say something untruthful I'll say that. I need to help myself out.[']" Finally, Mr.

---

[9] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). In *Machner*, we held that "it is a prerequisite to a claim of ineffective representation . . . to preserve the testimony of trial counsel." *Id.* at 804. The *Machner* hearing is the evidentiary hearing held on a defendant's ineffective assistance claim during which trial counsel, among others, is questioned regarding the alleged deficient performance. "The hearing is important not only to give trial counsel a chance to explain his or her actions, but also to allow the trial court, which is in the best position to judge counsel's performance, to rule on the motion." *State v. Curtis*, 218 Wis. 2d 550, 554, 582 N.W.2d 409 (Ct. App. 1998).

Langford concluded, if McDowell persisted in his plan to offer that theory of defense, he would be presenting "perjured testimony." Thus, Mr. Langford testified, he believed he was facing an ethical dilemma on which Wisconsin case law provided little if any guidance and, therefore, that the "cleanest" solution was to withdraw.

¶ 20. At the *Machner* hearing, Mr. Langford also elaborated on the events immediately preceding McDowell's testimony. "There was a juncture in discussions that Mr. McDowell had with myself and [Assistant State Public Defender] Deja Vishny on [the day he was going to testify] where there were several statements by Mr. McDowell[, o]ne of which [was] that he would proffer untruthful testimony if it would help him," and that McDowell had "stated the specifics" of what that untruthful testimony would be. He testified that he and Ms. Vishny had had "several discussions . . . with Mr. McDowell in the holding area in Judge Moroney's court" about his options including "narrative testimony versus a question and answer testimony." Indeed, responding to questions from the prosecutor, Mr. Langford testified that, in the course of those discussions, he, Ms. Vishny, and McDowell were quite clear:

> A: So then we talked about, well, if you testify in light of what you're saying. And what he was saying at the time were several things. One was, ["Y]ou know, I'll say what I need to say to help myself out and if I have to say something untruthful I'll say that. I need to help myself out.["]
>
> Q: Did he tell you that?
>
> A: Yes.
>
> Q: That even if he has to say something untruthful he will to help himself out?

621

A: Yes.

Q: And he told you right to your face?

A: Deja was actually asking—I should say having the colloquy with him. I was there. But she was trying to assist me in making sure that we covered this carefully and that he understood carefully what we were asking of him and fully understood what he was responding or was saying back to us.

So the question was put several ways by her. And one of the responses was, ["Y]es, if I have to testify untruthfully.["] . . . .

So that was . . . part of the discussion. But then the other part of the discussion talking to him about the ethical aspect of this and *he may have to get up there and testify in a narrative style and he was going to be on his own.*

Q: *So you did inform him of that?*

A: *Absolutely.*

Q: *And you told him what that would entail?*

A: *Right.*

Q: And you told him the reasons why?

A: Yes.

Q: And that was because of the position that he was placing you in as an attorney and the ethics that you must follow?

A: Yes.

Q: And he was clearly aware of that?

A: Yes.

. . . .

Q: *You told him that . . . he may have to testify in a narrative fashion?* Is that fair to say?

. . . .

A: *Yes.*

(Emphases added.) And in response to re-direct questions from McDowell's postconviction counsel, Mr. Langford further recounted what he had advised McDowell about narrative testimony: *"I made it clear to him that once you start talking make sure you say everything you want to say. You are going to get one kick at the cat."* (Emphasis added.)

¶ 21. Mr. Langford also presented details of the events leading to his shift from question-answer to narrative. He testified that, during McDowell's testimony, he was handed a note from "somebody with the public defender office" stating: "[Assistant State Public Defender William J.] Tyroler says go with a narrative. Tell that to the client. It must be by narrative." As a result, Mr. Langford explained, he converted to narrative. He conceded, however, that he did so without interrupting the testimony or advising McDowell of the shift, and, perhaps most significantly, without having concluded that McDowell "was going to lie." Answering questions from McDowell's postconviction counsel, Mr. Langford's testimony continued:

Q: So you get the note and all of a sudden the game plan changes, right?

A: Yes.

Q: You were present in court after he testified in a narrative fashion, were you not?

623

A: Yes.

Q: You heard his testimony?

A: Yes.

Q: You had corroborated what you said in your opening statement up to a certain point?

A: Yeah.

Q: He had corroborated the fact that he was behind the building at 4720 West Burleigh the day beforehand, right?

A. Right.

Mr. Langford then acknowledged, however, that McDowell's testimony had not specified that Sunshine "had performed oral sex on him," or that he "was not wearing a condom," or that he had "ejaculated on the ground . . . behind the building the day before [the assaults]," or that he had never met the victim or committed the assaults. Mr. Langford denied, however, that by converting to narrative form he had "abandoned" McDowell's defense.

¶ 22. At the *Machner* hearing, McDowell testified that he never told Mr. Langford or Ms. Vishny that he was going to testify untruthfully, and that Mr. Langford "never said that [he] may have to testify in a narrative." He also said that this was the first time that he had ever testified before a jury, and that he was "extremely nervous" and "confused." He described how he felt when Mr. Langford shifted from question-answer to narrative:

> [Mr. Langford] got me thinking differently. From one moment he going to be asking me questions. At one moment he want me to just tell a story. Had me going back and forth.

I don't know which one was what. I misunderstood. I thought I was going to be getting questioned and telling a story. I didn't know what was what.

. . . .

I felt confused. I didn't know which direction where we was going. At one point in time, I was supposed to be answering questions, and another I was being on my own. So I felt confused. I didn't know. Confused. I thought it was going to be both of them or what. I don't know. Just lost.

. . . .

[I felt abandoned b]ecause he told me one thing and did another.

McDowell then testified that, had he been asked questions, he would have testified that the night before the assaults Sunshine performed oral sex on him, that he was not wearing a condom, that he ejaculated at the scene, and that he never committed any of the crimes.

¶ 23. Denying McDowell's postconviction motion, the court stated, in part:

Attorney Langford under these conditions was not ineffective. He was put in an untenable position by his client and reacted, under the circumstances, in a way that best preserved his client's right without impugning his own ethical responsibilities to the Court and to the profession.

And I would add that even if another court were to disagree with this Court's assessment, I'm satisfied that had the defendant testified fully and completely, as defense counsel now says he wanted to, the outcome of this trial would have been no different. No reasonable jury could find for the defendant in light of the indisputable scientific evidence which puts the victim's sa-

liva with the ejaculate of the defendant. And that evidence was so powerful, . . . that no matter what the defendant testified to, he would have been found guilty.

Additional factual background will be presented in the course of our discussion.

## DISCUSSION

### I. "Request" for New Counsel

¶ 24. McDowell argues that the trial court erred in denying his request for new counsel. (And, as we will explain, McDowell specifically addresses *his request* on the first day of trial; he does not argue that the trial court erred in denying *Mr. Langford's motion to withdraw* on the last day of trial.) We reject his argument.

¶ 25. A trial court exercises discretion in determining whether to appoint new counsel to represent a defendant in a criminal case. *State v. Lomax*, 146 Wis. 2d 356, 359, 432 N.W.2d 89 (1988). If, at any point in the proceedings, a defendant presents a substantial complaint that reasonably could be interpreted as a request for new counsel, the trial court should inquire into the reasons for the request and determine whether new counsel is required. *State v. Kazee*, 146 Wis. 2d 366, 371, 432 N.W.2d 93 (1988). A trial court erroneously exercises discretion by failing to properly determine whether a request for counsel was justifiable. *Id.* at 368. Here, we conclude, because McDowell never requested new counsel, the trial court did not err by failing to make such inquiry or determination.

¶ 26. As the record reveals, on Monday, the first day of trial, Mr. Langford advised the court that McDowell had "fired" him over the weekend. As the record

also shows, however, neither Mr. Langford nor McDowell explained why. Neither specified the nature of whatever conflict had led to the "firing" over the weekend, and neither commented on whether any problem persisted. *See State v. Wanta*, 224 Wis. 2d 679, 703, 592 N.W.2d 645 (Ct. App. 1999) (defendant's requests for new counsel insufficient when unsupported by evidence of attorney incompetence, complete breakdown in communication, or conflict of interest). Not every disagreement between client and counsel constitutes an "irreconcilable conflict" requiring new counsel. *See id.*

¶ 27. Moreover, on the first day of trial, although Mr. Langford said he had been fired, he did not move to withdraw, and McDowell did not request new counsel. While we recognize that a defendant's request need not be phrased in "magic words," at some point it needs to be expressed, by either the defendant or counsel. *See Kazee*, 146 Wis. 2d at 368 (defendant's statement, "I don't want him," during defense counsel's opening statement constituted request requiring court's inquiry). Here, however, the record reveals no such request and, of equal significance, when the trial court stated that Mr. Langford "is staying on the case," neither Mr. Langford nor McDowell objected.[10]

---

[10] The State, conceding that the trial court "did not conduct a searching inquiry into the reasons why McDowell sought to discharge Attorney Langford," primarily argues that McDowell "did not offer the court any justification or evidence to support his request." The State's argument is correct; as we have explained, neither Mr. Langford nor McDowell offered any support for what otherwise could have been considered a request for new counsel. But, as we also have explained, McDowell not only failed to "offer the court any justification or evidence," he failed to make any such request.

¶ 28. As the record also reveals, on the last day of trial, after the State rested, Mr. Langford referred to an "off-the-record conversation in chambers" leading to his "suggest[ion] to the Court . . . that [he] would . . . be permitted to withdraw." For two independent and equally dispositive reasons, however, this forms no basis on which to conclude that the trial court erred in denying McDowell new counsel.

¶ 29. First, even if Mr. Langford offered something in chambers to support his suggestion, we must assume that the off-the-record proceedings supported the trial court's ruling. *See Duhame v. Duhame*, 154 Wis. 2d 258, 269, 453 N.W.2d 149 (Ct. App. 1989). Second, as noted, in this appeal McDowell specifically challenges the denial of his request for new counsel occurring on the *first* day of trial, not the denial of counsel's motion to withdraw on the last.[11] As we have explained, however, the record of the first day's colloquy falls far short of constituting any such request, and the

Still, we acknowledge the State's fair, albeit understated, concession. To say the least, the trial court "did not conduct a searching inquiry." While we have concluded that the record does not establish that McDowell ever requested new counsel, we do not endorse the trial court's quick "hogwash" reaction. A defendant's right to representation must be protected and, even absent an explicit request for new counsel, courts should inquire into what they may reasonably infer is a problem potentially undermining that right.

[11] Specifically, in his brief to this court, McDowell maintains that his "motion" for new counsel was "just before trial," and that Mr. Langford's "immediate disclosure on the first day of trial that he had been fired" was "tantamount to a request for new counsel."

denial of Mr. Langford's motion on the last day of trial is not the basis on which McDowell seeks relief.

¶ 30. Under *Lomax* and *Kazee*, a court erroneously exercises discretion by failing to determine whether a request for new counsel was justifiable. Here, the court received no such request. Accordingly, the court had no obligation to make any such determination.

## II. Ineffective Assistance of Counsel

¶ 31. McDowell argues that trial counsel was ineffective, effectively abandoning his defense by converting from question-answer questioning to narrative-response questioning during his testimony. He asserts that "[t]he most important issue before this court is determining whether or not Langford was deficient" in doing so. We conclude that he was. We also conclude, however, that because McDowell's defense was presented to the jury, because his defense was preposterous, and because the State's evidence was overwhelming, Mr. Langford's deficient performance was not prejudicial.

¶ 32. A defendant in a criminal case has a constitutional right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *State v. Ludwig*, 124 Wis. 2d 600, 606, 369 N.W.2d 722 (1985). To establish ineffective assistance, a defendant must prove that counsel's performance was both deficient and prejudicial. *Strickland*, 466 U.S. at 687; *Ludwig*, 124 Wis. 2d at 607. A defendant has a due process right to present a defense, and counsel's failure to assist a defendant in doing so may constitute ineffective assistance. *State v. Tabor*, 191 Wis. 2d 482, 496,

629

529 N.W.2d 915 (Ct. App. 1995). "The ultimate conclusion of whether the attorney's conduct resulted in a violation of the right to effective assistance of counsel is a question of law." *State v. Felton*, 110 Wis. 2d 485, 505, 329 N.W.2d 161 (1983).

## A. Defense Counsel's Dilemma

¶ 33. To evaluate Mr. Langford's performance in this case, we must determine the standards governing the conduct of criminal defense counsel who concludes that the defendant intends to testify falsely. The parties implore us to set those standards, not only to resolve this case but to assist the bench and bar in countless others causing similar concerns. Further, to assist this court, the parties have taken the constructive step of encouraging nonparty participation in this appeal by the Wisconsin Association of Criminal Defense Lawyers and the Frank J. Remington Center of the University of Wisconsin Law School[12] (collectively, the Remington Center). As a result, our analysis has been enhanced by the excellent briefing and valuable oral arguments of both the parties and the Remington Center.

¶ 34. What should criminal defense counsel do when he or she concludes that the defendant is going to testify falsely? As the Remington Center points out, this question necessarily begs another: "When does a lawyer *know* a client will lie, with sufficient certainty to

---

[12] The Frank J. Remington Center of the University of Wisconsin Law School provides, among other services, legal assistance to institutionalized persons including inmates of state and federal prisons in Wisconsin. The Center is staffed by law students working under the supervision of clinical faculty. The Center was named for the late Frank J. Remington, an esteemed professor of criminal law at the University of Wisconsin Law School.

warrant breaching client confidence and the duties of loyalty and zealous advocacy?" *See Strickland*, 466 U.S. at 688 (recognizing defense counsel's duty of loyalty to a defendant and the "overarching duty to advocate the defendant's cause").

¶ 35. The accuracy, and indeed, the stark significance of the Remington Center's question, must cause us pause. After all, the "duties of loyalty and zealous advocacy" are implicated as soon as an attorney: (1) divulges to the trial court the basis for the dilemma (i.e., the client's disclosure and/or other information leading to the expectation that the client will testify falsely); and/or (2) contemplates a trial strategy or questioning technique that is anything less than the most effective one to present the client's account.

¶ 36. While at first it may seem surprising that such significant questions, so often confronted by the defense bar, have not yet been answered in Wisconsin, we note the relatively recent origin of appellate attempts to address them. Not until 1986 did the United States Supreme Court resolve "whether the Sixth Amendment right of a criminal defendant to assistance of counsel is violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at his trial." *Nix v. Whiteside*, 475 U.S. 157, 159 (1986). And there, the Supreme Court began its analysis by recalling the relatively late development of the underlying principles leading to the defense dilemma:

> The right of an accused to testify in his defense is of relatively recent origin. Until the latter part of the [nineteenth] century, criminal defendants in this country, as at common law, were considered to be disqualified from giving sworn testimony at their own trial by reason of their interest as a party to the case . . . .

631

By the end of the 19th century, however, the disqualification was finally abolished by statute in most states and in the federal courts. Although this Court has never explicitly held that a criminal defendant has a due process right to testify in his own behalf, cases in several Circuits have so held, and the right has long been assumed. We have also suggested that such a right exists as a corollary to the Fifth Amendment privilege against compelled testimony[.]

*Id.* at 164 (citations omitted).

¶ 37. From *Nix*, we derive five principles that lay the foundation for our analysis:

- Whether simply "assumed," or as a corollary to the Fifth Amendment privilege against compelled testimony, or as a corollary to the Sixth Amendment right to assistance of counsel, a defendant in a criminal trial has a right to testify. *See id.* at 164. *See also Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987) (defendant's right to testify "is one of the rights that 'are essential to due process of law in a fair adversary process' " under the Fifth, Sixth, and Fourteenth Amendments).

- "Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*." *Nix*, 475 U.S. at 173.

- "It is universally agreed that at a minimum the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct." *Id.* at 169.

- "Although counsel must take all reasonable lawful means to attain the objectives of the client,

632

counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law." *Id.* at 166.

- "For defense counsel to take steps to persuade a criminal defendant to testify truthfully, or to withdraw, deprives the defendant of neither his right to counsel nor the right to testify truthfully." *Id.* at 173–74.

¶ 38. As critical as these principles are, they do not answer two questions. First, on what basis can defense counsel conclude that a defendant is going to testify falsely? Second, upon determining that a defendant is going to testify falsely, what must counsel do?

1. The Determination of Intended False Testimony

¶ 39. Although the Supreme Court declared the constitutional foundation for our analysis, it also clarified what may be a state's non-constitutional structure rising from that foundation:

> When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts.

*Id.* at 165. Thus, to answer the difficult questions presented here, we also turn to Wisconsin's standards governing counsel's conduct.

¶ 40. Supreme Court Rule 20:3.3 (1999–2000)[13], in relevant part, provides:

---

[13] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

**Candor toward the tribunal.** **(a)** A lawyer *shall not* knowingly:

 (1) make a false statement of fact or law to a tribunal;

 (2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

 . . . .

 (4) offer evidence that the lawyer *knows to be false.* If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

 **(b)** The duties stated in paragraph (a) apply even if compliance requires disclosure of information otherwise protected by Rule 1.6 [regarding confidentiality of information received from a client].

 **(c)** A lawyer *may* refuse to offer evidence that the lawyer *reasonably believes is false.*

(Emphases added.) And SCR 20:3.4, in relevant part, provides: "A lawyer *shall not . . .* falsify evidence, counsel or assist a witness to testify falsely." (Emphasis added.)

¶ 41. What, then, is the standard under Wisconsin's rules of professional conduct? On what basis can counsel determine whether a defendant intends to testify falsely? Must counsel "know" the intended testimony is false, *see* SCR 20:3.3(a)(4), or just "reasonably believe" it to be so? *See* SCR 20.3.3(c). *Must* counsel then refrain from presenting the testimony, under the former, or *may* counsel present it, under the latter? And finally, how do these rules comport with the

defendant's constitutional right to effective assistance of counsel?

¶ 42. While Wisconsin courts have not answered these questions under our rules, some commentators and courts have addressed them in comparable contexts.[14] Most recently, for example, the Supreme Judicial Court of Massachusetts, in the course of determining the standard by which counsel would "know" of a client's intended perjury, acknowledged the myriad approaches in the case law, including: "good cause to believe" a client intends to testify falsely; "compelling support" for such a conclusion; "knowledge beyond a reasonable doubt"; "firm factual basis"; "good-faith determination"; and "actual knowledge." *Commonwealth v. Mitchell*, 781 N.E.2d 1237, 1246–47 (Mass.) (citations omitted), *cert. denied*, 123 S. Ct. 2253 (2003).

¶ 43. The Remington Center "urge[s] that this court . . . adopt the most stringent standard, because anything less jeopardizes the defendant's right to have a jury decide the facts, undermines the relationship and role of defense counsel as zealous and loyal advocate, and is practically unworkable." Thus, the Remington Center recommends that we hold that "before defense attorneys can refuse to assist a client in testifying, they must know that the client will testify falsely based upon the client's affirmative statement of intent to lie." Subject to certain qualification and elaboration, we agree.

---

[14] For a recent summary of the different approaches to defense counsel's dilemma, under Model Rule 3.3 of the American Bar Association's Model Rules of Professional Conduct, which is substantially similar to SCR 20.3.3, *see* Brian Slipakoff & Roshini Thayaparan, *The Criminal Defense Attorney Facing Prospective Client Perjury*, 15 GEO. J. LEGAL ETHICS 935 (2002).

¶ 44. We begin by explaining why we deem any lesser standard unsatisfactory. We base our analysis not only on the authorities and the standards they recommend, but also on our years of trial court experience presiding over hundreds of jury trials in criminal cases. In the trial courts, we gained understanding of the dynamics of defense representation and, in particular, of the forces that frequently motivate defense counsel to offer far less than zealous advocacy. To retreat from question-answer in presenting a defendant's testimony, when the defendant has *not* admitted any intent to testify falsely, would be a defining step in a sad parade —the pathetic parade that so often features the travesty of defense counsel marching defendants to negotiated guilty pleas and *Alford* pleas when defendants maintain their innocence.[15]

---

[15] *See North Carolina v. Alford,* 400 U.S. 25 (1970). "An *Alford* plea is a guilty plea in which the defendant pleads guilty while either maintaining his innocence or not admitting having committed the crime." *State v. Garcia,* 192 Wis. 2d 845, 856, 532 N.W.2d 111 (1995).

Although no *Alford* plea is involved in this appeal, *Alford* pleas highlight concerns about defense advocacy that are central to our discussion. Perhaps more than any other defense technique, *Alford* pleas expose the most alarming abandonment of advocacy. Simply stated, every *Alford* plea, in effect, presents a client telling counsel, "I'm innocent," and counsel advising, "Plead guilty anyway."

The frequently heard explanation for *Alford* pleas is that, without them, defendants would not plead guilty and cases would go to trial. So? When defendants deny guilt, trials may follow and defendants (who just hours or days before were being counseled to plead guilty) sometimes are acquitted. Moreover, when a court declines to accept an *Alford* plea, a trial may *not* follow. Instead, in some cases, the prosecution re-evaluates the evidence and either moves for dismissal or for a proper amend-

¶ 45. Any lesser standard—not requiring a client's admission to counsel of the intent to testify falsely—would eclipse the bright-line guidance that, the parties and the Remington Center agree, is needed. With a lesser standard, on what would counsel base a "reasonable belief"? How, really, would counsel "know," absent an admission from the defendant? And then, what would be counsel's corresponding duty? In trial preparation, would counsel investigate the facts in order to advocate zealously, or to determine the veracity of a client's account? Should counsel refrain from looking too carefully at the facts for fear of concluding that a client's account is false? Without a client's admission of intent to testify falsely, counsel sails swirling seas, changeable from one moment to the next, without a single star by which to chart a course.

¶ 46. Far better for counsel to remember that "[e]xcept in the rarest of cases, attorneys who adopt 'the role of the judge or jury to determine the facts,' pose a danger of depriving their clients of the zealous and loyal

---

ment of the charges based on the evidence. In other cases, defendants, not allowed to enter *Alford* pleas, become more candid and admit guilt. That, in turn, leads to more meaningful sentencings, uncompromised by lingering protests of innocence.

Thus, although *Alford* pleas are sanctioned by the decisions, they are incompatible with truth and justice. The fact that "in Wisconsin a trial court *can* accept an *Alford* plea," *State v. Johnson*, 105 Wis. 2d 657, 663, 314 N.W.2d 897 (Ct. App. 1981) (emphasis added), does not mean that a trial court should do so. Similarly, just as a client's declaration of innocence must control counsel's advice regarding a plea (regardless of what may be counsel's suspicions of the client's guilt), a client's declaration of intent to testify truthfully must control counsel's presentation of that testimony (regardless of what may be counsel's suspicions about the client's account).

advocacy required by the Sixth Amendment." *Nix*, 475 U.S. at 189 (citation and footnote omitted). And far more realistic for counsel to maintain the unique humility of "not knowing," absent an admission by the client. Concurring in *Nix*, Justice Stevens eloquently reminded counsel and courts alike of how *our* perspectives may, at times, reduce the reliability of our factual assessments.

> Justice Holmes taught us that a word is but the skin of a living thought. A "fact" may also have a life of its own. From the perspective of an appellate judge, after a case has been tried and the evidence has been sifted by another judge, a particular fact may be as clear and certain as a piece of crystal or a small diamond. A trial lawyer, however, must often deal with mixtures of sand and clay. Even a pebble that seems clear enough at first glance may take on a different hue in a handful of gravel.

> . . . .

> . . . A lawyer's certainty that a change in his client's recollection is a harbinger of intended perjury—as well as judicial review of such apparent certainty—should be tempered by the realization that, after reflection, the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked.

*Nix*, 475 U.S. at 190–91 (Stevens, J., concurring).

¶ 47. Thus, we accept that counsel cannot be omniscient and, accordingly, we embrace the mandate, under SCR 20:3.3(a)(4), that counsel "shall not . . . offer evidence that the lawyer *knows* to be false." (Emphasis added.) Therefore, we conclude, absent the most extraordinary circumstances, criminal defense counsel, as

a matter of law, cannot *know* that a client is going to testify falsely absent the client's admission of the intent to do so. Accordingly, we interpret SCR 20:3.3(c)'s suggestion that counsel "may refuse to offer evidence that the lawyer reasonably believes is false" to apply to circumstances beyond the borders surrounding the questions involving a criminal defendant's stated intention to testify falsely. Any other interpretation would, in our estimation, produce an irreconcilable conflict between the two rules. *See State v. Zielke*, 137 Wis. 2d 39, 51, 403 N.W.2d 427 (1987) (appellate court "must interpret statutes to avoid absurd or unreasonable results" and "must harmonize conflicting statutes and provisions to give each reasonable effect").

¶ 48. And with our "absent extraordinary circumstances" qualification, we do not mean to obscure the bright line or invite endless litigation over what such circumstances might be. We simply recognize that, in the never-ending succession of factual scenarios confronting counsel and the courts, to *never* allow for the possibility that, absent the client's admission, counsel could "know" would be to ignore the truly exceptional case—one that, even absent a client's direct admission to counsel, might present virtually the same dilemma.[16]

¶ 49. Similarly, we do not obscure the bright line by holding, as one of the proposals at oral argument would have, that counsel can only "know" when the client's admission is corroborated. To do so would

---

[16] Consider, for example, the modern-day Bonnie and Clyde, caught full-faced on video and apprehended at the scene of the crime, who inform counsel of their intent to testify (*truthfully,* they say) that they were never even in the bank. The *absolutely conclusive* evidence of their presence, beyond all doubt, would present counsel's dilemma no less than if they had stated their intent to testify falsely.

re-submerge counsel and the courts in the swamp of uncertainty over whether certain evidence was sufficient to corroborate that a client's intended false testimony is indeed false.

¶ 50. More pointedly, we emphasize the singular significance of the client's admission to counsel. *Despite* confessions *to others,* and despite what may seem to be overwhelming corroborative evidence, counsel must not presume to *know* whether a client's account is true. As the Remington Center reminds us, its Wisconsin Innocence Project has had direct experience with a case in which the evidence, including a confession, led defense counsel to be certain of his client's guilt of rape and murder. The defendant, after claiming innocence for several months, finally admitted his guilt to both counsel and the court. Years later, however, DNA evidence established his innocence. *See* Keith Findley & John Pray, *Lessons from the Innocent,* Wis. Acad. Rev. 33 (Fall 2001).

¶ 51. The standard we set is consistent with the underlying principles in *Nix.* Although the Supreme Court did not address the precise questions we now answer, it is noteworthy that the Court announced what we deem to be its five unassailable standards *not* in the context of a case where counsel had mere misgivings about a client's account, but rather, in the course of defining "the range of 'reasonable professional' responses to a criminal defendant client who *informs counsel that he will perjure himself on the stand." Nix,* 475 U.S. at 166 (emphasis added); *see also id.* at 167 (referring to traditional canons of professional ethics and their "exception to the attorney's duty of confidentiality" in the event of "a client's announced intention to commit a crime" including perjury).

640

## 2. Counsel's Duty

¶ 52. Thus, we conclude that, with the rarest of exceptions, absent a criminal defendant's admission of an intent to testify falsely, defense counsel must protect the defendant's right to testify and, when the defendant decides to testify, assist the defendant with effective questioning to facilitate the presentation of the defendant's account. Short of "knowing" that one's client intends to testify falsely, counsel must proceed as a zealous advocate. Regardless of suspicions about a defendant's account, counsel must assist the defendant in presenting it if the defendant desires to do so and maintains that the account is true.

¶ 53. If, however, a defendant informs counsel of the intention to testify falsely, counsel's "first duty . . . is to attempt to dissuade the client from the unlawful course of conduct." *Id.* at 169. Cynics aside, we do not dismiss the persuasive power of counsel to do so on ethical, legal, and moral grounds. Additionally, counsel may be persuasive on pragmatic grounds. By explaining what may be the evidentiary weakness of the false account, counsel can describe the likely consequences that, obviously, the defendant does not desire. Such consequences may include a greater likelihood of conviction brought about by a defendant's incredible account, a longer sentence, *see Lange v. State*, 54 Wis. 2d 569, 575, 196 N.W.2d 680 (1972) ("the trial judge's appraisal of a defendant's attitude, including the evidence of his veracity at trial[,] is highly relevant to the exercise of sentencing discretion"), and the potential for a perjury prosecution. Thus, as the Supreme Court has emphasized, defense counsel's effort to dissuade a defendant from testifying falsely is wholly consistent with counsel's representation of a defendant's interests. *See Nix*, 475 U.S. at 168–71.

¶ 54. But some defendants will not be dissuaded. How, then, must defense counsel question the defendant who intends to testify falsely? "A lawyer with a perjurious client must contend with competing considerations—duties of zealous advocacy, confidentiality and loyalty to the client on the one hand, and a responsibility to the courts and our truth-seeking system of justice on the other." *People v. DePallo*, 754 N.E.2d 751, 753 (N.Y. 2001). To contend with these considerations, courts have considered many approaches arguably available to defense counsel—from fully facilitating the presentation of perjurious testimony with customary question-answer questioning, to refusing to allow a defendant to testify or withdrawing from representation. *See People v. Johnson*, 72 Cal. Rptr. 2d 805, 811–18 (Ct. App. 1998) (presenting a comprehensive review of counsel's options). Under such circumstances, we conclude, only narrative questioning fairly accounts for both counsel's allegiance to the client and duty to the court. Only full disclosure to the court, followed by narrative questioning, provides the appropriate "method of effectuating both the right of the accused to testify and the duty of a defense lawyer not to assist in presenting known perjured testimony." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 120 cmt. i (2000).

¶ 55. In *Johnson*, the California Court of Appeal provided an extended, thoughtful analysis of a number of approaches and considered the possible disadvantages of each. *Johnson*, 72 Cal. Rptr. 2d at 811–15. Ultimately endorsing narrative questioning, it explained, in part:

> [T]he narrative approach represents the best accommodation of the competing interests of the defendant's right to testify and the attorney's obligation not to

participate in the presentation of perjured testimony since it allows the defendant to tell the jury, in his own words, his version of what occurred, a right which has been described as fundamental, and allows the attorney to play a passive role.

In contrast, the two extremes—fully cooperating with the defendant's testimony and refusing to present the defendant's testimony—involve no accommodation of the conflicting interests; the first gives no consideration to the attorney's ethical obligations, the second gives none to the defendant's right to testify.

*Id.* at 817. We agree. While we, like the California Court of Appeal, recognize that narrative questioning is not without its own difficulties, it is the best of several imperfect options.[17] *See also* Norman Lefstein, *Client*

---

[17] Under the circumstances, allowance for defense counsel's follow-up questions on ˙direct, or re-direct questions, would necessarily be limited. We do not, however, absolutely preclude them. For example, as in this case, questions eliciting a defendant's acknowledgement of prior criminal convictions would be proper.

Rather than precluding follow-up and re-direct questioning, we leave to the trial courts the careful, case-by-case assessment of whether any such questioning—for purposes of clarifying testimony given, not of amplifying a perjurious account with new testimony on additional subjects—would be appropriate. We also note that neutral, clarifying questions (such as "By 'that day,' are you referring to Friday or Saturday?", or "When you say 'he,' whom do you mean?") from the court may be appropriate and may obviate the need for any further questioning from defense counsel.

Additionally, as must be quite clear in the context of the instant appeal, the standards for counsel and the court also would be triggered when a defendant who, counsel believed, had been dissuaded from testifying falsely, unexpectedly begins to testify falsely. When this occurs, counsel must immediately ask

*Perjury in Criminal Cases: Still in Search of an Answer,*
1 Geo. J. Legal Ethics 521, 523 (1988) (surveying
defense counsel's options and concluding that "the nar-
rative approach is the most sensible").

¶ 56. Therefore, if the attempt to turn the defen-
dant away from perjury is unsuccessful, counsel must
inform the defendant that: (1) he or she may move to
withdraw;[18] (2) future counsel will have to operate

to approach the bench, inform the trial court of the need to
excuse the jury, and assure that the defendant is properly
advised.

[18] In the instant case, the trial court rejected Mr. Langford's
motion to withdraw on the last day of trial, correctly perceiving
the futility of that option. As the State points out:

> While permitting Attorney Langford to withdraw might have
> headed off some of the problems that occurred in this case,
> "[w]ithdrawal . . . may simply make an already difficult problem
> worse by creating endless rounds of withdrawals, encouraging the
> client to withhold incriminating evidence or to be less than candid
> with his subsequent counsel, or ultimately enabling a client to find
> an unethical attorney to aid in a fraud upon the court." Edward L.
> Wilkinson, *"That's a Damn Lie!": Ethical Obligations of Counsel
> When a Witness Offers False Testimony in a Criminal Trial,* 31 St.
> Mary's L.J. 407, 418 (2000) (footnote omitted).

*See also People v. Johnson,* 72 Cal. Rptr. 2d 805, 812–13 (Ct.
App. 1998) (permitting counsel to withdraw merely perpetuates
problem of defendant seeking to present false testimony with
the assistance of counsel); Norman Lefstein, *Client Perjury in
Criminal Cases: Still in Search of an Answer,* 1 Geo. J. Legal
Ethics 521, 550 (1988) (Despite having "actual knowledge" of a
client's intent to testify falsely, "counsel should not seek to
withdraw—and the profession's ethical rules should not sanc-
tion it—for withdrawal will most likely just pass the client
perjury problem on to another attorney.").

If counsel moves to withdraw, the trial court must evaluate
the motion according to the standards of *State v. Lomax,* 146

under the same legal standards, thus bringing about the likely repetition of the current circumstance; and (3) if continuing as counsel, he or she will not be allowed to suborn perjury and, therefore, will only be able to question the defendant by asking the usual formal, introductory questions, followed by a question or two eliciting a narrative response. Counsel must explain what that would entail and advise the defendant of the need to provide the full, intended account without added assistance of question-answer or redirect questioning to further the perjurious account.

■

¶ 57. If unable to dissuade a defendant from testifying falsely, counsel, outside the presence of the jury of course, must advise opposing counsel and the trial court before the defendant testifies. The court, in turn, must examine counsel and the defendant to ensure a clear and full record of: (1) the basis for counsel's conclusion that the defendant intends to testify falsely; (2) the defendant's understanding of the right to testify, notwithstanding the intent to testify falsely; and (3) the defendant's, and counsel's, understanding of the nature and limitations of the narrative questioning that will result.[19]

---

Wis. 2d 356, 360, 432 N.W.2d 89 (1988), and *State v. Kazee*, 146 Wis. 2d 366, 371–72, 432 N.W.2d 93 (1988). We note, however, that defense motions to withdraw under these circumstances will be far less frequent, and the granting of such motions far less likely, precisely because the standards we declare in this decision allow counsel to continue representing the defendant who declares an intent to testify falsely.

[19] The Supreme Judicial Court of Massachusetts, determining defense counsel's obligations under that state's rule of professional conduct equivalent to Wisconsin's SCR 20:3.3, concluded that a trial court was not required to conduct a

¶ 58. Under these standards, we now evaluate Mr. Langford's representation of McDowell.

## B. Application to this Appeal

### 1. Deficient Performance

¶ 59. In his brief to this court, McDowell emphasizes: "The note told Langford to 'go with a narrative and *inform* the client.' Langford did not inform the client. He immediately changed the strategy that he, as trial counsel, and Attorney Vishny had intended with respect to the presentation of [his] testimony." McDowell points out that, left to his own narrative, he never stated that Sunshine was performing oral sex on him, that he was not wearing a condom when he ejaculated,

---

colloquy, but only because the record of the defendant's understanding was clear. *Commonwealth v. Mitchell*, 781 N.E.2d 1237, 1249–50 (Mass.), *cert. denied*, 123 S. Ct. 2253 (2003). The court went on to explain:

> [A] judge, if the situation warrants, has discretion to conduct a colloquy at which a defendant is informed of his right to testify and his right to counsel, his attorney's ethical obligation not to place false testimony before the court, and the consequences of his attorney's invocation of [Massachusetts Rules of Professional Conduct] rule 3.3(e), namely, that the defendant will testify in narrative form and his counsel will not argue his testimony to the jury in summation. Any colloquy should be carefully controlled and conducted to elicit simple "yes" or "no" answers from the defendant, and, if the defendant expresses doubt or misunderstands, he should be directed to consult with counsel until he fully comprehends what rule 3.3(e) requires.

*Id.* While in this case we do not determine whether the record as a whole could ever constitute the equivalent of what, typically, would be the trial court's colloquy with counsel and the defendant, we urge trial courts to recognize that, more often than not, their colloquies will be pivotal in proving a defendant's understanding, and in protecting the rights of both parties.

and that he had not committed the crimes. Moreover, Mr. Langford's shift from question-answer to narrative was not triggered by any perceived perjury (at that point, McDowell had answered only three introductory questions), and was not preceded by any advice alerting McDowell to the shift about to take place.

¶ 60. Thus, in this initial phase of the analysis, it is important to clarify that the issue is not whether Mr. Langford's performance was deficient simply because he used narrative questioning. As we have explained, that approach may be proper. Rather, the issue is whether his performance was deficient because he shifted from question-answer to narrative without any triggering perjury causing him to do so, and without advising McDowell that he was going to do so. We conclude that, in both respects, Mr. Langford's performance was deficient.

¶ 61. Notwithstanding the "strong presumption that counsel acted reasonably within professional norms," *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990), deficient performance may be established by acts or omissions "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Here, even measured by nothing more than *Mr. Langford's assessment* of the ethical underpinnings of his performance, the deficiency is clear. Answering the prosecutor's questions at the *Machner* hearing, he testified:

> [A: Ms.] Vishny's opinion influenced my opinion as to what I felt should be done. And at that juncture when Mr. McDowell said[, "]I'm going to tell the truth,["] . . . we both felt that we had to accept what he was telling us.

> *And ... to then go out and put him on the stand in narrative fashion would not be ethical.* So that's why when I went out I told the court we were going to proceed in a "Q" and "A" fashion.
>
> Q: And that changed when you got the note from Mr. Tyroler?
>
> A: Yes.

(Emphasis added.) Mr. Tyroler's advice, however, apparently came without knowledge of Mr. Langford's and Ms. Vishny's understanding that McDowell intended to testify truthfully. (Nothing in the record suggests that Mr. Tyroler participated in the discussions with McDowell preceding his testimony, or that he was in the courtroom during the testimony.)

¶ 62. As the United States Supreme Court recently reiterated, ineffective assistance can consist of counsel's conduct that "resulted from inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) While a trial attorney has considerable latitude to select one trial strategy from among many alternatives, he or she must not abandon a sound strategy based merely "upon a whim." *See State v. Felton*, 110 Wis. 2d 485, 501–02, 329 N.W.2d 161 (1983). Here, as Mr. Langford implicitly conceded, but for the note from Mr. Tyroler, he had no reason to alter course.[20]

---

[20] Our conclusion is consistent with that of the late Dean of the Marquette University Law School, Howard Eisenberg, who testified at the *Machner* hearing. Dean Eisenberg opined that, *given Mr. Langford's undisputed account of the events,* his shift to narrative questioning was "inappropriate."

¶ 63. Thus, we conclude, Mr. Langford's performance was deficient. We also conclude, however, that his deficient performance was not prejudicial.

## 2. Prejudice

¶ 64. To prove prejudice, a defendant must show that counsel's deficient performance was so serious that he or she was denied a fair trial and a reliable outcome. *Strickland*, 466 U.S. at 687. To do so, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Here, McDowell has shown nothing more than the most remote possibility.

¶ 65. McDowell maintains that "defense counsel did not present the defense that [they] had selected, specifically, that [his] DNA was found at the scene because he had been sexually intimate there with a consenting partner on the day beforehand and had ejaculated on the ground." We disagree.

¶ 66. We readily acknowledge that McDowell's testimony could have been enhanced and clarified through counsel's questioning. Here, however, the jury

Dean Eisenberg was called by McDowell to testify as an expert witness, *see* Wis. Stat. § 907.02, and give his opinion on the legal issue of whether Mr. Langford rendered effective assistance of counsel. Although we appreciate the salutary motives behind calling Dean Eisenberg, we reiterate that no witness may testify as an expert on issues of domestic law; "the only 'expert' on domestic law is the court." *Wisconsin Patients Comp. Fund v. Physicians Ins. Co.*, 2000 WI App 248, ¶ 8 n.3, 239 Wis. 2d 360, 620 N.W.2d 457.

was able to consider McDowell's essential defense. Simply stated, despite the limitations of narrative testimony, McDowell presented his oral-sex-the-night-before defense to the jury.

¶ 67. Evaluating the whole trial, one soon recognizes that what McDowell considers so significant is hardly significant at all. He protests, for example, that, due to lack of question-answer testimony, he never denied committing the crimes. In context, however, his denial is clear. And he protests that he never testified that Sunshine "performed oral sex on him" and that he "ejaculated on the ground." But obviously, when McDowell testified that he and Sunshine were "fooling around and had oral sex in the back," the jury, using common sense and remembering that Mr. Langford, in opening statement, said that McDowell had ejaculated, would have inferred that McDowell was explaining why his semen was found at the scene. Then, when Mr. Langford, in closing argument, observed that "[t]here is an expectation that you could find [DNA] evidence of Mr. McDowell being related and associated with 4720 West Burleigh," the jury got the message again.[21]

---

[21] Even though, as the court correctly instructed the jury, opening statements and closing arguments were not evidence, Mr. Langford's comments, both in opening and closing, need not be ignored in evaluating whether, in the full context of the trial, McDowell's testimony presented his essential defense. Thus, this case is distinguishable from those in which defense counsel, in opening statement, promises a defense that is never delivered. *See, e.g., Sielaff v. Milwaukee County*, 200 Wis. 2d 105, 111, 546 N.W.2d 173 (Ct. App. 1996) (recognizing that for an attorney to fail to deliver on what was promised in opening statement can be "devastating" particularly where "the other side . . . [is] able to capitalize on it"). Here, we note, the

¶ 68. Thus, because the jury was presented with McDowell's defense, he suffered little loss arising from Mr. Langford's deficient performance. Further, even if one were to view the reduced effectiveness of McDowell's narrative testimony as more consequential than we deem it, he suffered no prejudice for two even more powerful reasons: his defense was preposterous, and the State's evidence was overwhelming.

¶ 69. McDowell's defense depended on his account of oral sex the night before with Sunshine at the very location where the assaults occurred. Not only was that theory far-fetched, but it was not going to be supported by any testimony from Sunshine who, Mr. Langford concluded, should not testify given the inconsistencies between her and McDowell's accounts of their claimed encounter. But, of course, that's not all. McDowell's defense depended not only on the jury's acceptance of his oral-sex-the-night-before account, but also on the extraordinary coincidence of the victim's semen-filled saliva landing on the exact location of his ejaculate. It was not just that McDowell's DNA was discovered at the scene, but that his semen was mixed with the victim's saliva. As Mr. Langford testified at the *Machner* hearing, not only was McDowell's oral-sex-the-night-before defense a stretch, it was not, standing alone, exculpatory. Mr. Langford was blunt: "The bottom line . . . was . . . that mixed sample put his penis in her mouth."

¶ 70. Although McDowell, in his brief to this court, maintained that he had "a plausible explanation for why his DNA was found at 4720 W. Burleigh," at oral argument before this court, even McDowell's appellate

---

prosecutor, in closing argument, said nothing to suggest that the defense had failed to offer the defense it promised in opening statement.

counsel conceded that the saliva-landing-in-the-ejaculate defense depended on a coincidence that was both "implausible" and "improbable." We agree. Thus, regardless of whether McDowell, with question-answer testimony, would have provided additional details, and regardless of whether his theory of defense was remotely or theoretically *possible,* he has not established the *reasonable probability* that a more effective question-answer presentation of that defense would have resulted in his acquittal. *See Strickland,* 466 U.S. at 694 (to prove prejudice, defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[22]

¶ 71. Finally, the State's evidence was overwhelming. The brutal assault of the victim was undisputed; only the identity of the attackers was at issue. The DNA evidence, establishing that McDowell's semen was re-

---

[22] McDowell, in both his brief and at oral argument, attempted to make much of the fact that the jury, during deliberations, advised the court that it needed to know the "time frame between [the] sexual act with girlfriend and the time [the victim] was assaulted." The court answered by telling the jury to use its "collective memory relative to the time frame."

McDowell argues that the jury's inquiry "demonstrat[es] interest in [his] testimony," and that the court's answer provided no help because the jury "was never provided with enough facts to consider at what time on April 20, 1997 [the oral sex with Sunshine] occurred . . . [or] *any* facts as to whether or not [he] assaulted [the victim] on April 21, 1997." He neglects to acknowledge, however, that Mr. Langford's question, introducing his narrative testimony, framed the subject in "what [McDowell was] doing on April 20, 1997, through the early morning hours of April 21, 1997." As long as the April 20–21 sequence of evidence was clear, the exact times of the claimed oral sex on April 20 and the assault on April 21 were immaterial.

covered in the same sample with the victim's saliva, proved that the probability of selecting a person at random with the same DNA profile would be one in six billion. Only two explanations accounted for the mix of the victim's saliva and McDowell's semen. One was logical, the other preposterous. Thus, we conclude, Mr. Langford's deficient performance was not prejudicial.[23]

## III. Jury Instructions

¶ 72. McDowell argues that because the court instructed the jury, on both counts three and five, that "emission of semen is not required, but may occur," it effectively told the jury that both counts involved penal intrusion when, in fact, count three involved the gun-barrel assault. Thus, he maintains, confusion clouded the conviction on count three and, as a result, that conviction violates his double-jeopardy protection. Further, on all five sexual assault counts, McDowell maintains that the standard unanimity instruction, in combination with the information and verdict forms, failed to "factually differentiate the counts," thereby denying his rights to "jury unanimity and verdict specificity."

---

[23] We reject the argument that prejudice must be presumed here. Although many cases have clarified that prejudice may be presumed in circumstances where counsel is actually or constructively absent from a critical stage of the proceedings, *see, e.g., United States v. Cronic,* 466 U.S. 648 (1984); *Javor v. United States,* 724 F.2d 831 (9th Cir. 1984), Mr. Langford was not absent and McDowell was not unrepresented during his testimony. *See also Nix v. Whiteside,* 475 U.S. 157, 187 (1986) (Blackmun, J., concurring for four justices, and, without any dispute in the majority opinion, declaring that lower court "erred in concluding that prejudice should have been presumed").

¶ 73. McDowell did not object to the instructions. Thus, under WIS. STAT. § 805.13(3), he waived his challenge to the instructions.[24] *See also State v. Schumacher*, 144 Wis. 2d 388, 402, 408–09, 424 N.W.2d 672 (1988). Further, having failed to pursue this subject at the *Machner* hearing, McDowell makes no ineffective-assistance claim on this point. He does contend, however, that, under WIS. STAT. § 752.35 (2001–02), discretionary reversal of all the sexual assault counts is appropriate because "the real controversy has not been fully tried."[25] We disagree.

---

[24] WISCONSIN STAT. § 805.13(3) (1999–2000) states:

INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.

[25] WISCONSIN STAT. § 752.35 (2001–02) states:

**Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure

¶ 74. Under WIS. STAT. § 752.35, we may order a new trial where an erroneous jury instruction prevented the real controversy from being fully tried. *State v. Harp*, 161 Wis. 2d 773, 776, 469 N.W.2d 210 (Ct. App. 1991). Our authority to do so is very broad. *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). Here, however, we see no basis for doing so.

¶ 75. Although the trial court erred in instructing that, on the count involving gun-barrel penetration, "emission of semen is not required, but may occur," the error was harmless because, based on other portions of the record, the jury was able to disregard that portion of the instruction and distinguish count three from all others, and distinguish among all the sexual-assault counts. *See State v. Dyess*, 124 Wis. 2d 525, 541–42, 370 N.W.2d 222 (1985) (verdict stands if error "did not influence the jury or had such slight effect as to be *de minim[i]s*"). The jury knew that one of the counts involved gun-barrel penetration and, therefore, any instruction relating to semen-emission on that count was simply nonsensical. Further, as the State points out, the record establishes that count three, as well as the other sexual-assault counts, were accurately described and distinguished by: the criminal complaint and information; the trial court's jury instructions at the beginning of the trial; the victim's testimony; and the prosecutor's opening statement and closing argument. McDowell offers no reply. *See State v. Peterson*, 222 Wis. 2d 449, 459, 588 N.W.2d 84 (Ct. App. 1998) (unrefuted argument deemed conceded).

in that court, not inconsistent with the statutes or rules, as are necessary to accomplish the ends of justice.

¶ 76. Evaluating the possible impact of an erroneous jury instruction, we view the instruction in the context of the entire trial to determine whether there is a reasonable possibility that the jury was misled such that the error contributed to the defendant's conviction. *State v. Zelenka*, 130 Wis. 2d 34, 49–52, 387 N.W.2d 55 (1986). Clearly, in this case, the full context establishes that the erroneous instruction could not have misled the jury or produced any double-jeopardy violation.

¶ 77. Similarly, we reject McDowell's claim that defense counsel was ineffective for "permitting [the five sexual-assault counts] to be presented to the jury under the information, verdict and amended jury instructions because [his] rights to jury unanimity and verdict specificity were thereby violated." First, as noted, McDowell failed to pursue this subject at the *Machner* hearing, thus foreclosing any review in the ineffective-assistance context. Second, McDowell's theory here is essentially the same as the one we just discussed; it rests on a factual premise—indistinguishable counts caused jury confusion—belied by the record. Therefore, for the reasons we have just explained, the context here, unlike that in *State v. Marcum*, 166 Wis. 2d 908, 917–22, 480 N.W.2d 545 (Ct. App. 1992), the case on which McDowell primarily relies, allowed for no significant jury confusion.

IV. Sentencing.

¶ 78. Finally, in a brief argument, McDowell contends that he is entitled to re-sentencing because he was sentenced based on inaccurate information. He explains:

In this case, the trial court passed sentence thinking that defendant claimed to have had "sex . . . with [his] virgin girlfriend" on April 20, 1997. The court apparently confused defendant's description to the presentence investigator of his current girlfriend . . . as a virgin with his trial testimony about his relations with a previous girlfriend . . . .

Additionally, the court sentenced defendant on the basis of a conclusion that he would be "the first guy seeking retribution" if this had happened to someone to whom he was allied, such as a mother or sister. There is nothing in the record whatsoever to substantiate this conclusion.

Although the record supports McDowell's contention that the sentencing court may have been mistaken about one matter, McDowell's arguments fail.

¶ 79. A criminal defendant has a due process right to be sentenced based on accurate information. *State v. Lechner*, 217 Wis. 2d 392, 419, 576 N.W.2d 912 (1998). To gain re-sentencing on this basis, a defendant must prove by clear and convincing evidence that the challenged sentencing information was inaccurate and that the court relied on it in deciding the sentence. *See id.*

¶ 80. Here, although the court may have been confused about the two girlfriends, McDowell offers nothing to establish that any such confusion was consequential. Nothing in the court's sentencing remarks suggests that the court's confusion about the girlfriends affected its sentencing decision. And, contrary to what McDowell implies, the court's comments about "retribution" did not require factual substantiation; they

were nothing more than a rhetorical observation, without any apparent connection to the ultimate sentencing decision.

*By the Court.*—Judgment and order affirmed.